STATE of Minnesota, Respondent,

v.

David EDMISON, Appellant.

No. C3–86–1351.

Court of Appeals of Minnesota.

Dec. 23, 1986.

C. Paul Jones, Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas Foley, Ramsey Co. Atty., Darrell C. Hill, Asst. Ramsey Co. Atty., St. Paul, for respondent.

Considered and decided by HUSPENI, P.J., and SEDGWICK and LANSING, JJ., with oral argument waived.

## OPINION

SEDGWICK, Judge.

Appellant pleaded guilty to assault in the second degree as the result of his physically abusing a 14 month-old infant for whom he was babysitting. He appeals from the sentence of 52 months in prison, a double durational departure. We affirm.

## FACTS

The facts are not in dispute. Appellant David R. Edmison (also known as Roy L. Buchanan), a resident of Sparta, Wisconsin, moved into the St. Paul home of his girlfriend, Helen Buchanan, in December 1985. On December 19, 1985, a 14–month old child named Robert came to stay with them temporarily. Robert's mother, a friend of Buchanan's, needed to stay with her other child who was in the hospital. Buchanan agreed to care for Robert at her home.

On December 24, Robert returned to his home. His parents noticed that he was severely bruised and appeared to have been burned. They took him to St. Paul's Children's Hospital that night.

The doctor who initially examined Robert determined that he had been physically abused and had sustained life-threatening injuries. Robert was found to have multiple bruises and abrasions on his head, face, back, stomach, legs, arms, groin and buttocks; possible burns on his forehead and in his groin area; open wounds on his forehead and in his right ear; blood in his left ear; a hemorrhage in his right eye; dried blood in his nose; bleeding in his groin area; indications of fractured ribs; and symptoms of brain injury. He was hospitalized for eight days.

The hospital notified the St. Paul Police Department that Robert had been abused. They contacted Buchanan, who denied that Robert had been abused while in her home. Eventually, however, Buchanan decided to cooperate with the police. She gave the police the following account of Edmison's abuse of the infant during the time he was left in their care.

One day she saw Edmison following the child as he walked, knocking him down by hitting him in the back of his head. Edmison would then laugh and say "good boy," and kick the child in the back with his hiking boots. This lasted approximately one half-hour.

Another day Buchanan came home and found Robert restrained in a baby harness which was attached to a doorknob. Robert's hands were tied behind his back with shoelaces and a stocking cap was pulled over his eyes. Edmison told her he had done that because the child had been rubbing his eyes. Buchanan began preparing lunch; she heard Robert screaming in another room.

Edmison had placed the child on the floor and was tying an extension cord around his ankles. He had pulled the child's pants down around his ankles and was wrapping the cord around the pants; he told Buchanan that this way there would be no marks. Robert's hands were still tied behind his back and he still had the stocking cap on.

Edmison hung the baby upside down in the closet by wrapping the extension cord around the clothes bar. He stuffed a sock into Robert's mouth to muffle his screams. Edmison then twisted the cord and let it go, so that the child would spin around. While the child was spinning, Edmison would reach over and pinch him. He did that for about ten to fifteen minutes. He then closed the closet door and let the child hang there for approximately ten more minutes.

When Buchanan resumed preparing lunch, Edmison told her he was going to let Robert down. Buchanan then heard a thump in the other room. She found Robert lying on the closet floor. Edmison said the cord broke.

On another day, Edmison gave Robert a cold shower. He put the child in a tin shower stall and directed the water at him by moving the nozzle. The child was screaming and falling on the floor trying to get out, and Edmison kept pushing him back in. When Robert was let out he was shivering and his lips were blue.

Buchanan told the police that Edmison had left Minnesota and returned to Wisconsin on December 28, 1985, after she told him that the police had called her. Edmison called her late the night he left and bragged to her that she, not he, would get in trouble for what he did because he was out-of-state.

Buchanan agreed to help the police arrest Edmison. She arranged to meet him at a motel in St. Paul on February 3, 1986. The police arrested him when he arrived.

That night the police questioned him in jail about the assaults. Edmison waived his *Miranda* rights.

He admitted kicking Robert "medium hard" because "he wouldn't stand up. He was always laying in the doorway when I came through so I pushed him out of the way."

He admitted giving Robert the cold shower, and stated that the child was "banging his head in the shower" trying to get away from the cold water while he blocked the opening.

He admitted tying Robert upside down in the closet, stuffing something in his mouth because "he was screaming" and spinning him around. When asked why, he gave the following explanation:

> She didn't want to watch him. She expected me to change him, shower him and feed him. He wouldn't eat and when he did he would throw up. I thought to myself, what kind of kid is this. Jesus Christ. I thought, I'm glad I don't have a kid like that.

When he was again asked why he had done that, he stated, "It wasn't to kill him. I suppose it was down right out to be mean." When asked why for a third time, he said it

was because Robert "already had bruises on his back [and] didn't need no more." Edmison admitted he was trying to do something that would not leave bruises.

Edmison was charged with kidnapping, Minn.Stat. § 609.25, subds. 1(3), 2(1) (1984), and assault in the second degree, Minn. Stat. § 609.222 (Supp. 1985); Minn.Stat. § 609.11 (1984). He initially pleaded not guilty to both counts, but he later pleaded guilty to the assault charge in exchange for the dismissal of the kidnapping charge. The prosecution reserved the right to seek a "double departure," that is, twice the presumptive sentence.

At the plea hearing, Edmison testified that he did not like Robert because

> [H]e wouldn't eat. He didn't want to play with our children. A few times he walked straight into a wall and then when he hit he'd fall down and lay on the floor. He laid around on the floor most of the time. He just wouldn't get up and play or do anything.

Edmison testified this made him angry, so when the baby was playing on the floor he would kick him in the back with his work boots. He testified that he also slapped Robert. He testified that he encouraged his older son to hit Robert and push him down because "my boy could get the best of him. I was sticking up for my boy."

Edmison testified that he had hung Robert upside down in the closet and spun him around because he "was disgusted with him, the way he acted." He did not remember if he stuffed a sock in Robert's mouth to stop him from screaming, but said he "probably might have."

Edmison also testified that when he gave Robert the cold shower he pointed the nozzle at him and Robert ran around in the shower trying to get out, but he blocked the doorway. Edmison did not remember if the child was screaming during the shower.

Edmison testified that he had been drinking during the time he was assaulting the child, but that he was not too drunk to know what he was doing. He admitted that "one reason" he left Minnesota after Robert went back to his parents was his assaults on the child.

At sentencing, Edmison waived the right to a hearing. In determining his criminal history score, the district court assigned Edmison one felony point because of a 1980 Wisconsin conviction for battery to a peace officer, a felony under Wisconsin law, for which Edmison had been sentenced to a $1250 fine. The court then sentenced Edmison on the assault charge to 52 months in prison, twice the presumptive sentence.

### ISSUES

1. Did the trial court err by treating appellant's prior foreign conviction as a felony conviction in determining his criminal history score?

2. Did the trial court err in sentencing appellant to twice the presumptive sentence?

### ANALYSIS

#### I.

Edmison argues that the court erred in assigning him one felony point based on his prior Wisconsin conviction for battery to a peace officer because (a) it is not a "conviction" under the Minnesota sentencing guidelines, and (b) if it is a conviction, it should not be considered a felony. If the Wisconsin conviction is not considered a felony conviction, Edmison's criminal history score would be reduced from one to zero, and his presumptive sentence would therefore be reduced.

(A) *Is the Wisconsin conviction a "conviction"?*

Edmison argues that his Wisconsin conviction should not be considered a prior conviction because it was based on a plea of no contest. Minnesota does not recognize such a plea. Edmison relies on the definition of "conviction" in Minnesota's criminal code:

> "Conviction" means any of the following accepted and recorded by the court:
> (1) A plea of guilty; or

(2) A verdict of guilty by a jury or a finding of guilty by the court.

Minn.Stat. § 609.02, subd. 5 (1984).

However, the sentencing guidelines state, "Out-of-state convictions include convictions under the laws of any other state * * *." Minnesota Sentencing Guidelines and Commentary II.B.501. Edmison was convicted under the laws of Wisconsin. He does not allege the conviction was invalid. *See Pilger v. State*, 337 N.W.2d 695, 698 (Minn.1983) (sentencing court should generally not look at the procedures that led to the prior foreign conviction in determining a defendant's criminal history score). The distinction between pleading guilty and no contest is therefore irrelevant in this context.

(B) *Was the Wisconsin conviction properly classified a felony?*

■ The classification of out-of-state convictions as felonies, gross misdemeanors, or misdemeanors for purposes of computing a defendant's criminal history score is governed by the offense definitions and sentences provided in Minnesota law. Minnesota Sentencing Guidelines and Commentary II.B.5; *State v. Marquetti*, 322 N.W.2d 316, 318–19 (Minn. 1982).

■ According to the Wisconsin complaint filed against Edmison, "battery to a peace officer" consists of intentionally causing bodily harm to a peace officer who was acting in an official capacity and the defendant knew the victim was a peace officer. The complaint states that Edmison and his brother assaulted a police officer who had gone to their home to investigate the shooting of their father by another one of Edmison's brothers. It further states that the officer had his "eyes poked, nose pulled, [was] slugged various times, and hit with what [he] believed to be his metal flashlight." The officer required 16 to 18 stitches on his head and approximately 10 stitches in his mouth as a result of his injuries.

Edmison was sentenced to a fine of $1250 for this crime. The sentencing guidelines provide:

If the offender's prior record involves convictions of offenses that were committed prior to August 1, 1983, for which fines were the only sanction given, use the following schedule to determine whether the offense should be characterized as a misdemeanor, gross misdemeanor, or felony for purposes of computing criminal history scores:

| If fine imposed is between: | Classify offense as: |
| --- | --- |
| $101–$700 | Misdemeanor |
| $501–$1000 | Gross Misdemeanor |
| more than $1000 | Felony |

Minnesota Sentencing Guidelines and Commentary II.B.107.

Edmison concedes that under this provision the Wisconsin conviction should be classified as a felony. He argues, however, that it should instead be classified as a misdemeanor because in 1980 the closest analogous Minnesota crime was assault in the fourth degree, which was a misdemeanor. Minn.Stat. § 609.224 (1980). In 1980, according to Edmison, Minnesota did not have a criminal statute specifically involving assaulting a police officer.

Minnesota now has such a statute. Minn.Stat. § 609.2231, subd. 1 (Supp. 1985), provides that any person who "assaults a peace officer * * * [who] is * * * executing any * * * duty imposed by law and inflicts demonstrable bodily harm is guilty of a felony."

The sentencing guidelines state:

Generally, the classification of prior offenses as petty misdemeanors, misdemeanors, gross misdemeanors, or felonies should be determined on the basis of *current* offense definitions.

Minnesota Sentencing Guidelines and Commentary II.B.504 (emphasis added). Since the Wisconsin complaint shows that Edmison's conduct would have violated Minn. Stat. 609.2231, subd. 1, the Wisconsin conviction was correctly classified as a felony. *See State v. Yanez*, 373 N.W.2d 640 (Minn. Ct.App.1985).

## II.

Edmison's brief states that he "personally contends" that the doubling of his pre-

sumptive sentence was an "unjust desert" because the trial court "failed to consider the frustrations he was experiencing at the time the assault occurred and the fact that he was remorseful."

█ A trial court's decision to depart from the presumptive sentence will be reversed only upon a clear abuse of discretion. *See State v. Garcia*, 302 N.W.2d 643, 647 (Minn.1981). The trial court may do so when the case involves "substantial and compelling circumstances." Minnesota Sentencing Guidelines and Commentary II.D.; *Garcia*, 302 N.W.2d at 647. The general issue facing a sentencing court in deciding whether to depart durationally is whether the defendant's conduct was significantly more or less serious than that typically involved in committing the crime. *State v. Back*, 341 N.W.2d 273, 276 (Minn. 1984). A judge must provide written reasons justifying the departure. *Garcia*, 302 N.W.2d at 647.

█ The sentencing guidelines provide a nonexclusive list of aggravating factors that may be used as reasons for departure. Minnesota Sentencing Guidelines and Commentary II.D.2. The trial court relied on three of these:

(1) the victim was particularly vulnerable due to age or reduced physical or mental capacity which was known or should have been known to the offender;

(2) the victim was treated with particular cruelty for which the individual offender should be held responsible; and

(3) the current conviction is for an offense in which the victim was injured and there is a prior felony conviction for an offense in which the victim was injured.

All of these reasons are supported by the record and they are sufficient to support the trial court's decision. *See, e.g., State v. O'Brien*, 369 N.W.2d 525, 527 (Minn.1985); *State v. Partlow*, 321 N.W.2d 886 (Minn. 1982); *State v. Robinson*, 388 N.W.2d 43,

46 (Minn.Ct.App.1986), *pet. for rev. denied*, (Minn. July 31, 1986).

Although generally the upper limit on an upward departure is twice the presumptive sentence, a greater departure is justified in "rare cases in which the facts are * * * unusually compelling." *State v. Evans*, 311 N.W.2d 481, 483 (Minn.1981). Appellant's behavior was different both in degree and in kind from the typical second-degree assault because of his extraordinary cruelty and the young age and utter helplessness of the victim. As the trial court noted when it imposed sentence, this was not merely an assault; this was a "very vicious torturing of a 14–month old child." Robert will likely suffer permanent physical and psychological injuries as a result of the abuse appellant inflicted on him. The supreme court has approved greater than double departures in child abuse cases involving severe aggravating circumstances. *See State v. Stumm*, 312 N.W.2d 248 (Minn.1981); *see also State v. Wellman*, 341 N.W.2d 561 (Minn.1983) (Amdahl, C.J., concurring). Although we intend no criticism of the sentencing court, we believe this is such a case.

### DECISION

The trial court did not err in determining appellant's criminal history score or in doubling his presumptive sentence.

Affirmed.