**STATE of Minnesota, Respondent,**

v.

**David Leon BUTZIN, Appellant.**

**No. C3–86–829.**

Court of Appeals of Minnesota.

April 21, 1987.

Review Denied June 9, 1987.

Hubert H. Humphrey, III, Atty. Gen., William F. Klumpp, Jr., Sp. Asst. Atty. Gen., St. Paul, Minn., B. Joseph Majors, II, Wadena Co. Atty., Wadena, Minn., for respondent.

C. Paul Jones, State Public Defender, Michael F. Cromett, Asst. Public Defender, Minneapolis, Minn., for appellant.

Heard, considered and decided by PARKER, P.J. and HUSPENI and FORSBERG, JJ.

## OPINION

FORSBERG, Judge.

Appellant David Leon Butzin was convicted of second degree murder for the deaths of his wife, Melody Butzin, and his 18 month old son, Alexander Butzin, pursuant to Minn.Stat. § 609.19(1), (2) (1984). After denying motions to quash the indictments and to suppress his confessions, the court sentenced appellant, departing durationally from the Minnesota Sentencing Guidelines. The trial court then denied appellant's motions for a *Schwartz* hearing and for a new trial. Butzin appeals the judgment of conviction and sentencing pursuant to Minn.R.Crim.P. 28.02. We affirm.

## FACTS

On August 14, 1985, the bodies of Melody and Alex Butzin were recovered from Cat Creek in Wadena County. Autopsies revealed that the cause of the deaths was by drowning, occurring on or about August 13, 1985. On August 13, Melody and Alex visited Melody's mother, Caryl Smith, leaving around 3:15 p.m. Between 4:00 to 4:30 p.m. Melody phoned her sister-in-law, Sandra Butzin. This was the last time anyone spoke to, or remembered seeing Melody or Alex.

Several witnesses testified that they had seen appellant at various times on August 13. Stewart Ruwersma stated that he saw appellant drive past his farm between 6:07 and 6:17 p.m. The State, however, impeached Ruwersma's testimony by introducing evidence that after appellant was arrested, he phoned Ruwersma to discuss the time he had driven past the farm. Tom Hennessy testified that appellant stopped by his farm between 6:40 and 6:50 p.m. and sold him some steel fence posts from the back of his pick-up. Appellant then helped him unload the posts into a shed. Between 6:55 and 7:15 p.m., appellant arrived at the home of John Schwartz. He remained there until 10:00 p.m. Appellant then went to the Smiths' home between 10:00 and 10:30 p.m. and asked if they had seen his wife and son. The Smiths replied that they had not seen them since their visit that afternoon.

Richard Eckenrode and Hennessy testified that appellant stopped by their homes on August 14, inquiring about his family. Hennessy suggested that appellant contact a local deputy sheriff, Mike Herbst. Appellant testified that he went to see Herbst, but that no one answered his knock. At 11:45 a.m. appellant arrived at the Smith home and informed them that he had found Melody's car by the Cat Creek bridge, located about one-half to two-thirds of a mile from appellant's home. Smith called the sheriff, then he and appellant met the sheriff and his deputies at the bridge. Melody's body was discovered about forty-five minutes later. Divers recovered Alex's body at approximately 3:30 p.m. The creek was fairly shallow—the depth of the water ranging from one to five feet.

Initially, the officers believed that the deaths were accidental, and thus did not photograph footprints or tire tracks at the scene. The officers testified, however, that there were two different sets of adult prints near and adjacent to the driver's side of Melody's car. Child-sized prints were also found. They identified one set of adult prints as belonging to Melody, and the child-size prints as belonging to Alex. Autopsies performed on the bodies revealed that both bodies had a number of minor bruises which were sustained at or within one hour before death. These injuries included bruises on Melody's forehead, right forearm, elbows, chest and thigh, and on the back of Alex's head, face, and chest. Melody had no alcohol in her system.

On August 16, a local insurance man informed the sheriff that appellant had purchased a substantial amount of insurance on his wife just before her death. Further investigation revealed that although Melody was unemployed and collecting A.F.D.C. and food stamps, her life was insured for $239,000.00. $100,000 and $80,000 policies were purchased one day, and five days, respectively, before Melody's death. A $25,000 policy was purchased one month before her death, and a $10,000 policy was issued on August 11, 1983. Another policy for $24,000 was paid through September 1, 1985, two weeks after Melody's death. Finally, an application for a $25,000 policy had been completed on July 13, 1985. Alex's life was also insured for $6,000. Appellant was the primary beneficiary of each policy.

On August 26, 1985, appellant went to the law enforcement center at the request of Deputy Young. Young told appellant that he wished to ask him some questions regarding the deaths. He and appellant then entered the sheriff's private office. Young read appellant his rights from a card. He stated:

> You have the right to remain silent. Anything you say can be used against you in court. You have the right to an attorney. If you cannot afford an attor-

ney, one will be appointed for you at no cost. Do you understand these rights?"

Young asked appellant if he understood his rights, and appellant replied affirmatively. Young then requested that the interview be tape-recorded. Appellant agreed. The interview lasted one hour. Appellant never indicated that he wanted to stop talking or to speak to a lawyer. He answered all the questions, but falsely stated that his wife was insured for only $80,000. At this time, appellant stated that he did not know when Melody and Alex had died. Appellant then spent one-half to one hour with Richard Polipnick, a private investigator hired by Wadena County to assist in the investigation. Polipnick stated to appellant: "David, you're in a world of hurt, aren't you? Why don't you tell me what happened out there at Cat Creek, David?" Appellant then confessed to the murders. He stated that Melody and Alex had fallen into the water and that he had panicked and had run away. Polipnick then asked appellant if he would give his statement to one of the officers. Appellant agreed, but told Young and Officer Nelson that his earlier statement was not completely true, stating that he had really "bumped" Melody and Alex into the water. He stated that after watching them struggling in the creek, he unsuccessfully attempted to save them. At 6:15 p.m., the officers obtained a written statement. Appellant then read the two-page statement, made some corrections, which he initialed, and signed the statement. He was given a copy and was placed under arrest.

After spending the night in jail, appellant requested to see Deputy Young again. Appellant informed Young that his earlier statement was still not completely accurate. He then stated that he, Melody, and Alex had left their home about 6:00 p.m. to catch minnows. He then stated that Melody's death was not accidental, but that he had pushed her into the creek, wanting her to die. He stated that as he walked down the bank toward her he made up his mind to push her into the creek. He said that he knew that she could not swim, and had left the car at the bridge to make the deaths appear accidental. Young then asked some specific questions, typed out the new statement and gave it to appellant. Appellant again read through the statement, made and initialed some changes, and signed it. Appellant also told Melody's father, Tom Smith, that he had been at Cat Creek and was responsible for Melody going into the water.

At trial, appellant denied that he had committed the murders. He testified that he had falsely confessed to the murders because he felt responsible for the drownings, which he claimed would not have occurred had he allowed his wife to buy minnows for Alex. He claimed that he told the officers "whatever fit," and denied asking to see Young before making his second statement. He also denied portions of his written statements, although he admitted reading, correcting, and signing the statements. He claimed that since making the statements he had regained his desire to live, and dismissed the statements as "manufactured lies."

Appellant's credibility was impeached by evidence that the receipt of A.F.D.C. and food stamps was achieved by defrauding Wadena County, and by evidence that appellant had lied to insurance agents when obtaining the insurance on his wife. When appellant purchased the $80,000 policy on August 9, 1985, he falsely told the agent that Melody's life was insured only for $24,000. Appellant admitted lying to the agent, stating that if he had told the truth the company would not have issued the policy. Appellant claimed that the $100,000 policy was obtained to replace the $80,000 policy, since the larger policy provided more coverage and had cheaper premiums. He testified that Melody was to have canceled the $80,000 policy on August 13. The policy, however, was never canceled. Appellant testified that the insurance was obtained to "give Melody confidence during her pregnancy and birth."

Appellant further testified that he and Melody had many problems in their marriage. They were separated for a time, and appellant was experiencing financial difficulties in his calf business.

The trial court denied appellant's motions to dismiss the indictments, to suppress his confessions, and for a directed verdict of acquittal on the first degree murder charge. The court then sentenced him to 180 months for Melody's death and to 210 months, consecutively, for Alex's death. Appellant then requested that the court grant a *Schwartz* hearing, and moved for a new trial. Appellant appeals from the conviction and the sentence.

## ISSUES

1. Was appellant fully apprised of his fifth amendment rights per *Miranda?*

2. Did the State prove by a preponderance of the evidence that appellant waived these rights knowingly, intelligently, and voluntarily?

3. Did the trial court err in refusing to quash the indictments over appellant's objection that inadmissible, prejudicial testimony had been admitted?

4. Did the trial court err in denying appellant's motion for a *Schwartz* hearing?

5. Did the trial court err in its handling of a jury request?

6. Was the evidence sufficient to sustain the verdicts?

7. Did the trial court clearly abuse its discretion in departing from the sentencing guidelines?

## ANALYSIS

### I.

Appellant argues that the trial court erred in refusing to suppress his confessions, claiming that he was not advised of his rights per *Miranda;* and that due to the inadequacy of the warning, he did not knowingly and intelligently waive his rights, and that his confessions were involuntary.

#### A. *Adequacy of Warning*

■ Appellant claims that the warning given to him informing him of his constitutional rights was inadequate under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), because Deputy Young did not expressly inform him of his right to the presence of an attorney both before and during questioning. Appellant claims that this warning was not a "fully effective equivalent" of the warning as set forth in *Miranda,* and thus violated his privilege against self-incrimination as contained in the fifth and fourteenth amendments of the United States Constitution.

The federal circuits are split on this issue. *See generally* Annot., 77 A.L.R.Fed. 123 (1986). The Ninth and Fifth Circuits have held that a defendant is entitled to be expressly informed that he has the right to the presence of an attorney before and during questioning. In *United States v. Noti,* 731 F.2d 610 (9th Cir.1984), the Ninth Circuit found inadequate a warning that informed defendant that he "had the right to the services of an attorney *before* questioning." *Id.* at 614 (emphasis supplied). In *Windsor v. United States,* 389 F.2d 530 (5th Cir.1968), the Fifth Circuit stated that a warning that provided that defendant could "speak with an attorney or anyone else before saying anything at all," did not comport with the requirements of *Miranda. Id.* at 533. In each of these cases, however, the defendant's right to speak with an attorney was qualified to a time before questioning. Similarly, appellant cites a recent decision by this court, *State v. McBroom,* 394 N.W.2d 806 (Minn.Ct. App.1986), *pet. for rev. denied* (Jan. 16, 1987), in which we held that a *Miranda* warning was inadequate because it premised the right to appointment of counsel to a future date *after* the interrogation. *McBroom,* 394 N.W.2d at 812.

The Eighth Circuit has ruled inconsistently on this issue. In *Evans v. Swenson,* 455 F.2d 291 (8th Cir.), *cert. denied,* 408 U.S. 929, 92 S.Ct. 2508, 33 L.Ed.2d 342 (1972), the court held that the reference to the right to make a telephone call, which immediately preceded the information of the right to an attorney, clearly suggested that the defendant could call an attorney before the interrogation. *Evans,* 455 F.2d at 295–96. The court held that the statements, taken together, clearly informed the defendant that he had the right to have an

attorney at that time, before making any statements, and before and during any interrogation. *Id.* Moreover, in *Tasby v. United States,* 451 F.2d 394 (8th Cir.1971), *cert. denied,* 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1972), the court held that advising the appellant that "an attorney would be appointed 'at the proper time' * * even though a slight deviation from *Miranda* did not negate the overall effectiveness of the warnings." *Tasby,* 451 F.2d at 398–99.

In *South Dakota v. Long,* 465 F.2d 65 (8th Cir.1972), *cert. denied,* 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973), however, the court found a warning invalid which instructed the defendant that he had the right to an attorney and the right to remain silent. *Long,* 465 F.2d at 70. Although the court cited *Evans* and stated that the substance of the warnings prevailed over the form, it nonetheless found the warning inadequate for failing to specifically apprise the defendant of his right to an attorney during questioning. *Id.*

In *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), the United States Supreme Court denied that the "rigidity" of *Miranda* extended to the precise formulation of the warnings given a criminal defendant. *Id.* at 359–60, 101 S.Ct. at 2809–10. The court then favorably cited *United States v. Lamia,* 429 F.2d 373 (2d Cir.), *cert. denied,* 400 U.S. 907, 91 S.Ct. 150, 27 L.Ed.2d 146 (1970), in which the Second Circuit held that *Miranda* is satisfied by the inference that can be drawn from a combination of statements that the individual has the right to remain silent and that he has the right to consult with counsel. *Prysock,* 453 U.S. at 360, 101 S.Ct. at 2809, *citing Lamia,* 429 F.2d at 377. *Accord, United States v. Adams,* 484 F.2d 357, 361–62 (7th Cir.1973); *United States v. Davis,* 459 F.2d 167, 168–69 (6th Cir.1972); *Coyote v. United States,* 380 F.2d 305, 308 (10th Cir.), *cert. denied,* 389 U.S. 992, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967) (court would not indulge semantical debates over the particular words used to inform individuals of their rights).

In this case, appellant was told before any questioning had begun that he had the right to remain silent and the right to an attorney. The right was not expressly limited to any particular phase, such as "before any questioning," nor was it linked to a future point in time. We hold that the warning adequately apprised appellant of his fifth amendment rights. We believe that under *Prysock,* a *Miranda* warning is to be judged from a practical viewpoint and it is sufficient if the statements considered together convey the substance of the defendant's constitutional rights. The warning given appellant informed him in a common-sense way that he had an unqualified right to have an attorney present in general, and that he was entitled to the presence of an attorney before any questioning began. Although appellant was not specifically told that he had the right to have an attorney present during actual questioning, such an inference can readily be drawn from the circumstances of the warning. *Cf. Noti,* 731 F.2d at 616 (Choy, J., dissenting).

Moreover, we seriously question whether appellant was in custody at the time of his first confession. A *Miranda* warning is only required when the defendant is "in custody." *Miranda v. Arizona* defined "custodial interrogation" as "questioning by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. "[A] non-custodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' * * * The ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler,* 463 U.S. 1121, 1124–25, 103 S.Ct. 3517, 3519–20, 77 L.Ed.2d 1275 (1983), *citing Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

The United States Supreme Court concluded in both *Beheler* and *Mathiason* that *Miranda* warnings were not required in situations where the defendant made a confession without being apprised of his fifth amendment rights after having gone voluntarily to a police station to discuss a crime. In *Mathiason*, the police told defendant that he was a suspect, and falsely informed him that his fingerprints had been found on the scene. In this case, appellant voluntarily went to the police station to discuss the murders. He was neither placed under arrest, nor informed that he was not free to leave. Appellant was questioned in the sheriff's office, and confessed after approximately three and a half hours. The necessary restraint on appellant's freedom of movement for an in-custodial interrogation is lacking in this case.

■ Appellant further claims that his second confession should have been suppressed because he was not given a second *Miranda* warning. Appellant's second confession took place approximately nineteen hours after the initial warning. Appellant asked to make another statement, and when asked if he remembered his rights, replied affirmatively.

The Minnesota Supreme Court has stated that the issue is "whether the lack of a second warning left the defendant unaware of the meaning or seriousness of the second interrogation." *State v. Andrews*, 388 N.W.2d 723, 731 (Minn.1986). In this case, appellant voluntarily went to the police station to answer questions, knowing the purpose of the interview. After being apprised of his constitutional rights, he made his first confession and was then arrested and spent the night in jail. The following morning, after breakfast, he asked to make a further statement. He was taken to the same office, and dealt with the same people as he had earlier. He knew the purpose of the second interrogation, having himself initiated the questioning. He expressly admitted that he knew and understood his rights, and then proceeded to make a second confession.

In *State v. Reilly*, 269 N.W.2d 343 (Minn. 1978), the court held that a second *Miranda* warning was not necessary where defendant was given a complete warning seven hours earlier, and before making his second statement, responded with an affirmative gesture that he understood his rights as previously explained. *Id.* at 347. *See also Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986) (no second warning required for defendant making confessions seven days apart). We hold that the trial court did not err in receiving the second confession into evidence.

### B. *Waiver*

■ Appellant also challenges the waiver of his fifth amendment rights, claiming that his confessions were not voluntary and that he did not knowingly and intelligently waive his rights.

### 1. Voluntariness

The due process clause of the fourteenth amendment requires that confessions be admitted only if they are made voluntarily. *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). To determine the voluntariness of a confession, the court looks at the totality of the circumstances. *Id.* at 513, 83 S.Ct. at 1343. In its most recent case on this issue, the United States Supreme Court has stated that coercive police activity is required to invalidate a confession claimed to be given involuntarily. *Colorado v. Connelly*, —— U.S. ——, 107 S.Ct. 515, 517, 93 L.Ed.2d 473 (1986).

The only "coercion" claimed by appellant is the statement made by Mr. Polipnick to appellant, in which he asked, "You're in a world of hurt, aren't you David?" This hardly meets the standard of stress-inducing techniques required to invalidate a confession. *Cf. State v. Garner*, 294 N.W.2d 725, 726 (Minn.1980) (officer admitted using techniques coupled with trickery and deceit to frighten defendants into confessing). Thus, we hold that the statement was given voluntarily.

## 2. Known Right

■ The waiver of the fifth amendment right to remain silent, must be knowing and intelligent. *State v. Linder*, 268 N.W.2d 734, 735 (Minn.1978). It may be an express statement by the accused that he is willing to answer questions, or it may be inferred from conduct—answering questions without hesitation or volunteering information in the absence of questions. *State v. Merrill*, 274 N.W.2d 99, 106 (Minn. 1978). Appellant agreed, following the *Miranda* warning, to answer questions on tape, and the next day volunteered further information. The trial court found that appellant, without hesitation, willingly answered Deputy Young's questions.

The evidence at trial showed that appellant was above average in his maturity and intelligence. He had graduated from high school and had managed an athletic team. The trial court found that no threats or promises were made to appellant to induce him to talk. Appellant had eaten, and was offered coffee and milk during the interrogation. All of these factors tend to support that the waiver was knowing and intelligent. Moreover, the general rule provides that the State will be deemed to have met its burden of proving a valid waiver if it shows that the warning was given and the defendant stated that he understood his rights and proceeded to give a statement, unless there is other evidence indicating that the waiver was not an intentional relinquishment of a known right. *See Linder*, 268 N.W.2d at 735. We have already concluded that the warnings given appellant were sufficient. Appellant stated that he understood his rights and gave his statement. He does not claim that there is other evidence indicating that his waiver was not an intentional relinquishment of a known right. We hold that the trial court did not err in determining that the State proved by a preponderance of the evidence that appellant's waiver was valid.

## II.

■ Appellant's challenges the denial of his motion to dismiss the indictments, pursuant to Minn.R.Crim.P. 17.06. Rule 17.06 permits a motion to quash an indictment when:

(1)(a) The evidence admissible before the grand jury was not sufficient as required by these rules to establish the offense charged or any lesser or other included offense or any offense of a lesser degree, [or] * * *

(2)(a) The indictment, complaint or tab charge does not substantially comply with the requirements prescribed by law to the prejudice of the substantial rights of the defendant.

Minn.R.Crim.P. 17.06, subd. 2(1)(a), (2)(a).

It is well-settled law in Minnesota that an indictment will not be quashed because some incompetent evidence comes before the grand jury if there is sufficient competent evidence to sustain it. Minn.R.Crim.P. 18.06, subd. 2. *See State v. O'Dell*, 328 N.W.2d 730, 731 (Minn.1983); *State v. Terrell*, 283 N.W.2d 529, 530–31 (Minn.1979).

Appellant cites *State v. Grose*, 387 N.W.2d 182 (Minn.Ct.App.1986) and *Dwire v. State*, 381 N.W.2d 871 (Minn.Ct.App. 1986), *pet. for rev. denied* (Apr. 11, 1986), to support his contentions. *Dwire* involved an unauthorized person in the grand jury room, and is thus inapplicable to this case. In *Grose*, 19 errors in the grand jury proceedings were claimed to have prejudiced substantial rights of appellant. *Grose* cited many prosecutorial errors, including the prosecutor's actions in overcoming the free will of the jury. This court agreed that the cumulative nature of the actions influenced the grand jury and prevented it from acting as an independent body. *Grose*, 387 N.W.2d at 190.

The challenged testimony in this case was given by Deputy Young, Mrs. Smith, and Dr. Schmitt. Young's comments essentially focused on his opinion of appellant's honesty and the issue of premeditation. Mrs. Smith's comments regarded certain "diary" type letters written by Melody and her opinion of the relationship between appellant and Melody. Dr. Schmitt's comments related to an inference of a "triple homicide," referring to Melody's pregnancy. The testimony was given in response to questions from grand jurors, and did not

involve responses to interrogation by the assistant county attorney. Indeed, the county attorney attempted to rectify the situation. The grand jury was informed at the initiation of the proceedings that the State did not intend to seek criminal charges regarding Melody's pregnancy.

The claimed errors in this case do not, in any way, reach the severity of *Grose.* Moreover, the alleged improprieties were made by witnesses responding to questions by the jurors, and were not made by the prosecutor. The trial court, in a very thoughtful memorandum, thoroughly analyzed the allegedly prejudicial, inadmissible comments made by the three witnesses. The court then reviewed the admissible evidence and concluded that the witnesses' statements did not justify quashing the indictments, as the cumulative effect of the statements did not destroy the atmosphere of fairness needed to return the indictments. We agree and hold that the trial court's refusal to quash the indictments was not an abuse of discretion. *See State v. Thompson,* 273 Minn. 1, 15, 139 N.W.2d 490, 502, *cert. denied,* 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1966).

### III.

■ Appellant claims that the trial court erred in denying his request for a *Schwartz* evidentiary hearing on his claim of jury misconduct. *Schwartz v. Minneapolis Suburban Bus Co.,* 258 Minn. 325, 104 N.W.2d 301 (1960). Under Minn.R. Crim.P. 26.03, subd. 19(6), if a defendant has reason to believe that jury misconduct has occurred, he must move the trial court immediately for a summary hearing. The court then determines whether to order a *Schwartz* hearing to interrogate the jurors under oath. Respondent claims that appellant waived his right to request a *Schwartz* hearing by his delay in notifying the court of the alleged juror misconduct. Appellant first learned of the conduct on Thursday, January 30, 1986. Counsel for appellant notified the court on Tuesday, February 4, 1986. We think that this short delay should not amount to a waiver.

■ The granting of a *Schwartz* hearing is in the discretion of the trial court. *Zimmerman v. Witte Transportation Co.,* 259 N.W.2d 260, 262 (Minn.1977); *State v. Larson,* 281 N.W.2d 481, 484 (Minn.1979), *cert. denied,* 444 U.S. 973, 100 S.Ct. 467, 62 L.Ed.2d 388 (1979). Rule 26.03, subd. 19(6), requires the defendant to establish a prima facie case of jury misconduct before a *Schwartz* hearing is mandated. *Larson,* 281 N.W.2d at 484. Appellant's evidence consists of statements by two female jurors made during trial that appellant was staring at them and that this "gave them the creeps"; and a statement by a male juror who had stood next to appellant in the bathroom that if appellant had touched him he "would have stuffed his head down the toilet." The same male juror allegedly stated during deliberations that his mind was made up before the testimony had started. The trial court instructed the jury during the trial to refrain from expressing any comments regarding appellant.

In its memorandum accompanying its order denying the *Schwartz* hearing, the trial court noted that the women's statements were natural human responses to an uncomfortable situation. The court cited *Olberg v. Minneapolis Gas Co.,* 291 Minn. 334, 191 N.W.2d 418 (1971), in which the court stated:

[i]t would be totally unrealistic to expect a juror * * * to purge his consciousness of any and all reflections upon the trial at hand—an event which to him is an extraordinary and rare occasion.

*Id.* at 341, 191 N.W.2d at 423. We think that the male juror's response, while unfortunate, lies in the same category.

Appellant also claims that the male juror did not honestly answer questions put to him at voir dire, since he allegedly stated in deliberations that his mind was made up before the testimony started. There is no record of voir dire. *Cf. State v. Benedict,* 397 N.W.2d 337 (Minn.1986). We have fully considered the statements made during trial and the hearsay and we hold that the trial court did not err in determining that appellant failed to meet his burden of showing evidence which would establish ju-

ror misconduct, and refusing to grant a *Schwartz* hearing. We agree with the trial court's determination that no additional facts would be gleaned by a hearing, and that the comments, if at all, only awkwardly fit within the exception to the general rule against permitting a juror to testify, since no extraneous prejudicial information or outside influence was improperly brought before the jury's attention. *See* Minn.R.Evid. 606.

#### IV.

■ Appellant claims that the trial court erred in declining to answer the jury's question regarding the time that a witness said she crossed the Cat Creek bridge. Respondent argues that this court may not consider this issue because appellant failed to object at trial, thereby failing to preserve this issue for appeal. In *State v. McMorris*, 373 N.W.2d 593 (Minn.1985), the court stated that if the defense attorney failed to object to the way the trial court handled a jury request, the defendant is deemed to have forfeited his right to have the appellate court determine whether the trial court abused its discretion. *Id.* at 595. Thus, this issue is not properly before us.

#### V.

Appellant claims that the evidence was insufficient to sustain the verdicts. Appellant faces a heavy burden to challenge the jury verdict. *State v. Tiessen*, 354 N.W.2d 473, 476 (Minn.Ct.App.1984). The verdicts must be sustained if a jury would reasonably have concluded that the defendant was guilty of the offense charged given the facts in the record and the reasonable inferences which can be drawn from them. *State v. Merrill*, 274 N.W.2d 99, 111 (Minn. 1978). The evidence must be viewed in the light most favorable to the prosecution and it is necessary to assume that that the jury believed the State's witnesses and disbelieved any contrary evidence. *State v. Wahlberg*, 296 N.W.2d 408, 411 (Minn. 1980). The determination of credibility, reliability, and weight to be given to the testimony of any witnesses lies with the jury. *State v. Pieschke*, 295 N.W.2d 580, 584 (Minn.1980).

■ The jury heard evidence that appellant went to the creek and intentionally pushed his pregnant wife and son into the water, knowing that neither could swim. Excessive amounts of life insurance had been purchased on Melody's life shortly before her death. Although there was conflicting evidence on the time at which certain witnesses saw appellant, or viewed the bridge, the jury could have believed the evidence most favorable to the State. Appellant confessed to the murders. His credibility was impeached by evidence that he had lied to insurance agents and police officers regarding the amount of life insurance on Melody, and that he was defrauding the Wadena County Welfare Department. We hold that the evidence was sufficient to support the verdicts.

#### VI.

■ Appellant argues that the trial court erred in upwardly departing from the sentencing guidelines. A court may durationally depart from the presumptive sentence only where the defendant's conduct was more serious than that typically involved in the offense committed. A trial court's decision to depart from the presumptive sentence will be reversed only upon a clear abuse of discretion. *State v. Edmison*, 398 N.W.2d 584, 589 (Minn.Ct. App.1986). Appellant claims that the factors used by the trial court to justify the upward departure were necessarily included in the crimes for which he was convicted.

In *State v. Stumm*, 312 N.W.2d 248 (Minn.1981), the Minnesota Supreme Court affirmed the trial court's decision to more than triple the presumptive sentence in a case in which defendant was convicted of second degree manslaughter in the death of his girlfriend's son. As factors justifying the departure, the court cited the age of the child victim (2 years), the particular cruelty (striking the child with his fist), and the failure to subsequently seek medical attention for the child. *Id.* at 249.

In *State v. Shiue,* 326 N.W.2d 648 (Minn. 1982), the court cited as factors justifying the upward departure: vulnerability of the child, lack of provocation, particular cruelty (thrown into a trunk and hit with metal bar), terror of one hour, conduct involving extensive planning, guile, cunning, and concealment. *Id.* at 654.

The trial court listed the following factors as justifying the upward departure:

1. Appellant knew that neither Melody nor Alex could swim;

2. Melody's vision was impaired;

3. Melody was holding Alex when she was pushed into the creek;

4. Melody was six-months pregnant;

5. The victims' vulnerability;

6. The medical testimony at trial regarding the pathology of drowning, especially the first stage of drowning in which Melody knew that not only would she die, but also her child Alex, and her unborn baby;

7. Alex was a witness to the assault on his mother;

8. Alex's age;

9. The violation of the trust relationship between appellant and his family.

Admittedly, the first factor merely seems to refer to the way in which the victims were killed. Nevertheless, the other factors are supported by the record and are sufficient to support the trial court's decision.

## DECISION

The decision of the trial court is, in all respects, affirmed.