**STATE of Minnesota, Respondent,**

v.

**Chao YANG, Appellant.**

**No. C8–94–1889.**

Court of Appeals of Minnesota.

June 20, 1995.

Review Denied Aug. 30, 1995.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Raymond F. Schmitz, Olmsted County Atty., James S. Martinson, Asst. County Atty., Rochester, for respondent.

John M. Stuart, State Public Defender, Marie L. Wolf, Asst. State Public Defender, Minneapolis, for appellant.

Considered and decided by RANDALL, P.J., and PARKER and HARTEN, JJ.

## OPINION

HARTEN, Judge.

Appellant Chao Yang was charged with two counts each of first and second degree murder involving the stabbing death of a woman and the resulting death of her unborn child. The jury acquitted him of both counts of first degree murder and convicted him of one count each of murder in the second degree and murder of an unborn child in the second degree. The trial court sentenced appellant to consecutive terms of 306 months, for a total sentence of 612 months. Appellant challenges his convictions and sentence.

## FACTS

At approximately 6:00 a.m. on January 19, 1993, Rochester police officers investigated a homicide at 511 Fourth Avenue Southeast in Rochester. When the officers arrived at the residence, they were met by Shoua Vue, husband of the victim, who appeared to be in a state of shock. The officers discovered the body of Blia Yang lying in a pool of blood in the living room. Officers also observed an open briefcase in the living room. The only people in the house were Shoua Vue and two young children.

The police called the county coroner, Dr. Paul Belau. Based on his observations, the coroner determined that Blia Yang could have died between 10:00 p.m. on January 18th and 2:00 a.m. on January 19th, and most likely between 11:00 p.m. and 1:00 a.m. During Belau's autopsy on Blia Yang's body, he discovered nine knife wounds—four on her neck, two on her left hand, and three on her torso, near her abdomen. The cause of death was exsanguination (bleeding to death) caused by a deep slash wound to the neck, which cut both carotid arteries, the esophagus, and the trachea. The three torso wounds appeared to have been made after the fatal slash to the neck. Belau found a near full-term male fetus, which would have been alive at the time of Blia Yang's death. The unborn fetus died of fetal anoxia (lack of oxygen) caused by the mother's death. A large quantity of sperm was present in a post mortem vaginal swab taken from Blia Yang's body.

Blia Yang had lived in a house with her husband, Shoua Vue, her mother, Dia Yang, and her two children. On the night of the murder, Dia Yang was in St. Paul, babysitting other grandchildren. She had left behind in her bedroom a suitcase containing $10,000 cash, which she had obtained in a lawsuit against her employer. Dia Yang had withdrawn the money from the bank to use to take a trip to Laos. She had told her

daughter, Blia Yang, about the money, and Blia Yang had told her husband, Shoua Vue. The $10,000 was stolen on the night of the murder.

On the day of the murder, Shoua Vue and Blia Yang were home together until Blia Yang took her mother to the bus station at around 2:00 p.m. Blia Yang returned with a combination lock briefcase that she had purchased. According to Shoua Vue, she had purchased the briefcase to hold items belonging to herself and Dia Yang.

Shoua Vue had plans to go to Treasure Island Casino that night with appellant, Yeng Chang, and Ricky Yang. At approximately 10:00 that evening, appellant and Yeng Chang arrived to pick up Shoua Vue. When the three men left, Blia Yang and the children were sitting on the couch. Shoua Vue locked the front and back doors when he left. The three men went to Cub Foods to catch a bus to the casino; they met Ricky Yang at the bus stop.

Appellant told the others that he was going to pick up his sister-in-law, Mao Vang, from work and that he would meet them at the casino. Ricky Yang, Shoua Vue, and Yeng Chang played cards at the casino until appellant arrived. Shortly thereafter, they all cashed in their chips and left for home. Appellant dropped off Ricky Yang at Cub Foods so that he could get his car. The other three men then went to Yeng Chang's house and played cards until approximately 6:00 a.m. Appellant gave Shoua Vue a ride home. When Shoua went to the back door, he discovered it was open. He turned on the lights and saw the open briefcase and then his wife's body on the floor. He found his children in bed crying.

The police began investigating all four men who went to the casino together on the night of the murder—Yeng Chang, Shoua Vue, Ricky Yang, and appellant. The police questioned each man several times, and took fingerprints and photographs. On January 26, 1993, the police took a second set of fingerprints from appellant and interviewed him

again. Appellant denied any involvement in the murder.

The next day, appellant went to Yeng Chang's house and told him that they should run away together because Shoua Vue had already run away.[1] Yeng Chang told him that he had done nothing wrong and that he had no money. Appellant appeared to be frightened. On several different occasions, appellant asked Yeng Chang to run away with him. He told Yeng Chang that Dia Yang had accused them of killing Blia Yang, and that it would not cost more than nine to ten thousand dollars to leave the country. Appellant also told Yeng Chang that they could consult his cousins who are lawyers and tell them that Shoua Vue had killed his wife.

During one of their conversations, appellant asked Yeng Chang to take a vow of silence, which in Hmong culture requires the parties to keep a secret for life; if one of them exposes the secret, the other will kill him. Yeng Chang told him he would not take the vow because he did not do anything wrong. After each of these conversations, Yeng Chang told the police what appellant had said.

Appellant eventually left town and went to California. After he was missing for three or four days, his brother, Ricky Yang, contacted the police. The police arrested appellant in Merced, California in October, 1993.

## ISSUES

1. Is the evidence sufficient to support appellant's convictions of second degree murder and second degree murder of an unborn child?

2. Does the trial court's imposition of consecutive sentences exaggerate appellant's culpability?

## ANALYSIS

■ 1. Appellant claims that the evidence was insufficient as a matter of law to support the jury's verdict. When the sufficiency of evidence is challenged,

---

1. Shoua Vue moved to Wisconsin shortly after the murder. He informed police of his move and kept in contact with them.

our review on appeal is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict they did.

State v. Webb, 440 N.W.2d 426, 430 (Minn. 1989). The reviewing court must assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." State v. Moore, 438 N.W.2d 101, 108 (Minn. 1989). When the conviction is based on circumstantial evidence,

the verdict will be sustained on appeal when the reasonable inferences from such evidence are consistent only with defendant's guilt and inconsistent with any rational hypothesis except that of guilt.

State v. Alton, 432 N.W.2d 754, 756 (Minn. 1988).

Appellant admits that the state proved he was having an affair with Blia Yang, and that he fled Minnesota in fear of police. Appellant claims, however, that the state failed to prove he killed Blia Yang.

■ Appellant claims that the evidence is not consistent with his guilt because of the timing. According to the casino's surveillance cameras and clock, appellant arrived at the casino at 12:50 a.m. The state's theory was that after appellant dropped off his sister-in-law at home shortly after 11:00 p.m., he drove to Blia Yang's house, had sexual intercourse with her, killed her, took $10,000, and drove to the casino. The state asserted that appellant had approximately 35 minutes in which to accomplish these acts before driving to the casino. Appellant claims that the state skewed the time frames and that it is equally possible to prove that appellant could not have acted so quickly. He claims that the state's time estimates depended on variables that were not measured.

Appellant claims that one variable was the length of time it took to travel from Rochester to the casino. The police measured the distance from appellant's house (which was approximately one block from Blia Yang's house) to the casino to be 59.8 miles. It took them approximately one hour and ten minutes to get to the casino, driving within the speed limit. One bus driver estimated that it usually takes between one hour and one hour and ten minutes to get from Cub Foods to the casino. Another bus driver testified that it usually takes approximately one and one-half hours. Both bus drivers testified that the bus makes up to three stops to pick up people along the way. On the night of the murder, the bus left Cub Foods at approximately 10:30 p.m. and Ricky Yang, Shoua Vue, and Yeng Chang were shown to have arrived at 11:44 p.m. (according to surveillance camera and clock).

There was also testimony from other individuals who have driven from Rochester to the casino. Shoua Vue testified that one time he made the trip in approximately 52 minutes; Yeng Chang testified that he usually makes the trip in 40 to 45 minutes. During an interview with police, appellant said that he probably left Rochester around 11:10 or 11:15 p.m. and arrived at the casino around 12:10 or 12:15 a.m. From this evidence, the jury could infer that appellant thought it took him approximately one hour to make the trip to the casino. The jury could reasonably infer from all this evidence that a driver could make the nonstop trip in approximately one hour.

Appellant claims that another time variable was the time it took appellant to pick up Mao Vang at IBM, bring her home, and leave. Mao Vang testified that she got home sometime after 11:00 p.m. She got off work at 10:48 p.m., and she estimates that it took her 5–7 minutes to get to the parking lot. Appellant was waiting for her when she got there, and took her directly home. When they arrived, sometime after 11:00 p.m., appellant went inside to use the bathroom. She also testified that she usually gets home between 11:20 and 11:25 p.m.

Choua Moua, appellant's wife, who lives downstairs from Mao Vang, testified that, sometime after she went to bed, she heard Mao Vang arrive home. Appellant came in, used the bathroom, and asked for money. Choua Moua gave him $150 to $200 and he left shortly thereafter. She did not see him again until 6:00 a.m. the next morning.

Appellant claims that the state's theory is possible only if appellant brought Mao Vang

home 10 to 15 minutes earlier than usual. Assuming, however, that appellant brought Mao Vang home at 11:20 p.m., and that the drive to the casino took one hour, that still leaves 30 minutes unaccounted for. Additionally, appellant himself told police that he left Mao Vang's house at approximately 11:10 or 11:15 p.m. The jury could have reasonably inferred from the evidence regarding timing that appellant had time to commit the murder.

Other evidence from which the jury could have reasonably inferred appellant's guilt includes evidence that Blia Vang had sexual intercourse with appellant within 12 hours of her death. Dr. Delores Schoenbauer, forensic scientist with the Bureau of Criminal Apprehension, testified that she tested a sexual assault kit obtained from Blia Yang's body and found a large quantity of sperm present in the vaginal swab. She estimated that the sperm was deposited within 12 hours before Blia Yang's death. Schoenbauer performed DNA testing on the sperm and determined that it was consistent with origination in appellant. She also tested DNA from the unborn child and determined that it was consistent with appellant being the father.

The evidence also shows that Blia Yang was home during the day of her murder, except for a period of time when she brought her mother to the bus station, and that appellant was at his wife's house the whole day. Considering evidence that the sperm found in Blia Yang's body was consistent with origination in appellant, that it was deposited within 12 hours of her death, and that appellant and Blia Yang had no opportunity to see each other earlier that day, the jury reasonably could have inferred that appellant had sexual intercourse with Blia Yang sometime during the night of January 18th. The fact that there was not a forced entry into Blia Yang's home is consistent with the state's theory that appellant returned to Blia Yang's house after dropping off Mao Yang.

There was also testimony from Gary Walton, Bureau of Criminal Apprehension forensic scientist, who concluded that a fingerprint stained with Blia Yang's blood discovered on a cosmetic bag in the briefcase found near Blia Yang's body was positively identified to be from the tip of appellant's right middle finger. The print was probably made by a bloody fingertip rather than by a fingertip placed in blood already on the bag, and it could have been imprinted up to 45 seconds after the fingertip became bloody. Appellant argues that this evidence does not explain when and under what circumstances the print might have been made. Since he and Blia had an intimate relationship, the fingerprint may have been impressed at another time when they were together. The jury reasonably could have inferred, however, that numerous blood drops found in the briefcase and the bloody fingerprint on the cosmetic bag within the briefcase were both made at the time of Blia Yang's death.[2]

The state argues that appellant's act of running away evidences his guilt. Appellant argues that the evidence points more strongly to fear of arbitrary police action. The evidence shows that appellant tried several times to get Yeng Chang to run away with him, telling him that they would both be arrested, although he never told Yeng Chang that he was guilty. Appellant left the state without telling anyone, and went to California where he used an assumed name. The jury could have interpreted appellant's actions as evidence of guilt.

Appellant points to several factors that he claims suggest that another person committed the crime. Among these are the lack of any evidence of blood in appellant's car, on his clothing, or on his person; the failure of the state to find the murder weapon or to connect a similar weapon to appellant; and the testimony of a 10-year-old neighbor who said he saw a car with its lights on in Blia's driveway at approximately 1:00 a.m. on the morning of the murder, and that he heard crying coming from the house at approximately 1:30 a.m.

These facts do not necessarily detract from the state's case. The coroner testified that the neck wounds were consistent with the assailant having been standing behind Blia

2. The blood drops in the briefcase had to have been left there on the day or night of the murder since Blia Yang did not purchase the briefcase until after 2:00 p.m. on the day of the murder.

Yang when he attacked, and that, consequently, the attacker would probably have had blood on only his hands. Additionally, although appellant claims that the evidence shows that he could not have brought a knife with him intending to kill Blia Yang because he had to pick up his sister-in-law due only to a last minute change of plans, his wife testified that when appellant left her house at 10:00 p.m., he knew that he had to pick up Mao Vang at IBM. Finally, the jury may have inferred that the cry heard by the neighbor came from one of Blia Yang's infant children.

While the state's case against appellant is not overwhelming, if the jury believed the state's witnesses, the reasonable inferences from the evidence are consistent only with appellant's guilt and inconsistent with any rational hypothesis except that of guilt. Accordingly, we conclude that the convictions are sufficiently supported by the evidence.

 2. Appellant claims that the trial court exaggerated appellant's culpability by imposing a consecutive sentence for his conviction of second degree murder of an unborn child since the fetus' death occurred as a result of the mother's death. The sentencing guidelines permit a court to impose consecutive sentences:

When the offender is convicted of multiple current felony convictions for crimes against different persons, and when the sentence for the most severe current conviction is executed according to the guidelines.

Minn. Sent. Guidelines II.F.2. Where multiple victims are involved "[i]t is the prerogative of the trial court to make the decision as to whether the sentences should be concurrent or consecutive." State v. Yant, 376 N.W.2d 487, 493 (Minn.App.1985), pet. for rev. denied (Minn. Jan. 17, 1986); see also State v. Allen, 482 N.W.2d 228, 231 (Minn. App.1992) (whether to impose consecutive sentences is within the discretion of the trial court), pet. for rev. denied (Minn. Apr. 13, 1992). When reviewing imposition of consecutive sentences, we must consider "whether consecutive sentences 'are commensurate with culpability and not an exaggeration of defendant's criminality.'" State v. Brom,

463 N.W.2d 758, 765 (Minn.1990) (quoting Bangert v. State, 282 N.W.2d 540, 547 (Minn. 1979)), cert. denied, 499 U.S. 940, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991).

The propriety of imposing a consecutive sentence for the murder of an unborn child is an issue of first impression in Minnesota. The Minnesota Supreme Court has upheld the imposition of consecutive sentences for convictions of crimes against more than one victim where the offenses are severe. See, e.g., Brom, 463 N.W.2d at 765 (defendant convicted of premeditated ax murders of four victims); State v. Cermak, 365 N.W.2d 243, 248 (Minn.1985) (defendant convicted of first degree criminal sexual conduct against five of her grandchildren); State v. Olson, 291 N.W.2d 203, 208 (Minn.1980) (defendant convicted of premeditated murder of three people); Bangert, 282 N.W.2d at 547 (defendant convicted of premeditated murder of two people). Neither the supreme court nor this court has considered, however, whether consecutive sentences are proper where the crimes are committed against both a mother and her unborn child in a single incident.

 The unborn child homicide statutes were enacted in 1986 and have been upheld against constitutional challenges. See 1986 Minn. Laws ch. 388; State v. Merrill, 450 N.W.2d 318, 322 (Minn.) (unborn child homicide laws do not conflict with Roe v. Wade decision because statutes do not impinge on woman's right to privacy), cert. denied, 496 U.S. 931, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990). Appellant was convicted under Minn. Stat. § 609.2662 (1992), which provides that a person is guilty of second degree murder of an unborn child if he

causes the death of an unborn child with intent to effect the death of that unborn child or another, but without premeditation.

Id. (1). The language of the statute follows the language of the second degree murder statute, except that "unborn child" is substituted for "human being" and "person." See Minn.Stat. § 609.19(1) (1992). An "unborn child" is defined as "the unborn offspring of a human being conceived, but not yet born." Minn.Stat. § 609.266(a) (1992). Under the sentencing guidelines, murder of an unborn child holds the same offense severity level as

murder and therefore yields the same presumptive sentence. Minn. Sent. Guidelines IV, V. The statute and sentencing guidelines therefore demonstrate an intent to treat the murder of an unborn child the same as the murder of a person who is not unborn. The Minnesota legislature has decided to treat the murder of an unborn child similarly to other murders both in determining criminal liability and in sentencing. Accordingly, consistent with legislative intent, we hold that a defendant may be sentenced consecutively for the death of an unborn child resulting from its mother's murder, provided it does not exaggerate the defendant's criminality.

We conclude that the imposition of a consecutive sentence here does not exaggerate appellant's criminality given his knowledge of Blia Yang's pregnancy, his relationship with both victims, his intrusion into Blia Yang's home, the viability of the unborn child, the vulnerability of the victims, the stab wounds inflicted in Blia Yang's abdomen after she was dead, and the fact that appellant did not attempt to call for help to save the unborn child after he murdered the mother. *See State v. Jones,* 328 N.W.2d 736, 738 (Minn. 1983) (invading privacy zone that surrounds victim's home and leaving victim without calling for medical help are aggravating circumstances); *State v. Wickstrom,* 405 N.W.2d 1, 6 (Minn.App.1987) (vulnerability of woman in eighth month of pregnancy is uniquely compelling), *pet. for rev. denied* (Minn. June 30, 1987); *State v. Butzin,* 404 N.W.2d 819, 830 (Minn.App.1987) (appellant's trust relationship with victim and fact that victim was six-months pregnant were aggravating factors), *pet. for rev. denied* (Minn. June 9, 1987).

## DECISION

The evidence is sufficient to support the convictions. The district court did not abuse its discretion in sentencing appellant to consecutive terms.

**Affirmed.**

RANDALL, Judge (concurring specially).
I concur in the result.