**STATE of Minnesota, Respondent,**

v.

**Darby Jon OPSAHL, Appellant.**

No. C8–93–67.

Supreme Court of Minnesota.

March 11, 1994.

Steven A. Pihlaja, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael Junge, McCleod County Atty., Jody Winters, Asst. County Atty., Glencoe, for respondent.

## OPINION

PAGE, Justice.

Darby Jon Opsahl appeals his 1992 convictions by a McLeod County jury for one count of murder in the first degree and two counts of murder in the second degree for the October 14, 1986, burglary and murder of Margaret Rehmann.[1] He was tried in the court of the Honorable LeRoy W. Yost and sentenced to life imprisonment on the first degree murder conviction.

Opsahl raises four issues on appeal: (1) whether his indictment should be dismissed because the grand jury heard inaccurate testimony concerning the results of a polygraph test that he had taken; (2) whether out-of-court statements allegedly made by a codefendant who was not available at trial were admitted in violation of his right to confront witnesses against him; (3) whether the evidence presented at trial was sufficient to convict him; and (4) whether his incarceration at Minnesota Correctional Facility–Oak Park Heights (MCF–OPH) constitutes cruel and unusual punishment because he is a quadriplegic.

The crimes for which Opsahl was convicted took place on the afternoon of October 14, 1986. Late that afternoon, Irvin Rehmann returned to his farm home at approximately 5:45 p.m. from a day of working at his son's farm, to find Margaret Rehmann, his wife of 43½ years, dead on the kitchen floor. Mrs. Rehmann had been shot once with a bullet that entered her forearm and chest, traveled through her right lung, her spinal cord, her left lung, and lodged in her chest wall. The Rehmanns lived in rural Lester Prairie. Mr. Rehmann had last seen his wife alive at lunch that afternoon. That morning, the couple had butchered some chickens and then Mr. Rehmann left to help out at his son's farm, located ½ mile away. Mr. Rehmann returned at noon for lunch and left again to work at his son's farm at approximately 1:00 p.m.

Investigators found that the door between the Rehmann's garage and kitchen had been kicked open, cracking the doorjamb, thus suggesting a forced entry. Nothing in the house appeared to have been disturbed, however, and Mr. Rehmann could not determine that anything had been taken. Mr. Rehmann kept a tin can with half-dollar pieces in it in the laundry room which was near the garage and kitchen, but he did not know whether any coins had been taken. Investigators found a shoe print, fingerprints, and a palm print at the scene, but failed to identify any of them. Mrs. Rehmann was killed by a bullet consistent in appearance, dimension, and weight with that fired by a .44 caliber handgun. The murder weapon was never located.

The initial investigation of the crime failed to produce any suspects. On September 21, 1987, Jeff Olson, a friend of Opsahl's, told Carver County Sheriff's Deputy Larry Wittsack that Opsahl might know something about the murder and wanted to talk. On September 22, 1987, Deputy Wittsack, Deputy Richard Waage, from the Hutchinson Po-

---

1. Specifically, Opsahl was convicted under Minn. Stat. § 609.185(3) (1986) (murder in the first degree—intentionally causing the death of another during a burglary of a dwelling); Minn.Stat. § 609.19(1) (1986) (murder in the second de- gree—intentionally causing the death of another without premeditation); and Minn.Stat. § 609.-19(2) (1986) (murder in the second degree—causing the death of another during the commission of a felony).

lice Department, and Investigator Wayne Vinkemeier, from the McLeod County Sheriff's Department, met with Opsahl and Olson. At that meeting, Opsahl stated that he and John Kanniainen had been committing burglaries in the Lester Prairie area about the time of the Rehmann murder, and that Kanniainen had in his possession a .44 caliber handgun. Opsahl told the investigators about the burglary of one farmhouse, which, by his description, matched the Rehmann residence fairly accurately. Opsahl stated that he remained in his car and worked on the car radio while Kanniainen went to the front door. Opsahl recalled seeing a woman with brown hair, wearing red, at the door. He also noticed some chickens. While Kanniainen was inside the house, Opsahl heard a shot. On returning to the car, Kanniainen claimed to have shot someone inside. Opsahl recalled that Kanniainen then showed him some half-dollar coins. Photos taken at the crime scene show Margaret Rehmann was wearing a blue smock over a pink blouse.

After Opsahl made these statements, Deputy Wittsack, Investigator Vinkemeier, and Deputy Waage drove Opsahl and Olson to Lester Prairie, hoping that Opsahl would be able to identify the residence. On seeing the Rehmann house, Opsahl reacted visibly and acknowledged that it could have been the place he and Kanniainen had burglarized.

The investigation continued and the police determined that Kanniainen had been in New Jersey the entire month of October, 1986, and so could not have been in Lester Prairie on the day of Mrs. Rehmann's murder. In April, 1988, the police informed Opsahl that Kanniainen could not have burglarized the Rehmann residence, and Opsahl responded that if Kanniainen had not done it, then he was not involved either.

Sometime during April of 1988, Opsahl took a polygraph test. The test indicated that Opsahl had responded truthfully to the examiner's questions. The record does not reflect, however, what questions Opsahl was asked.

In June of 1989, investigators took another statement from Opsahl. He again stated that Kanniainen had in his possession a .44 caliber handgun. He also made conflicting statements as to Kanniainen's presence in Minnesota in October of 1986. In conjunction with giving the statements, Opsahl accompanied the investigators to a store where he was shown a line-up of handguns. Of the weapons presented, Opsahl identified a .44 caliber Magnum as the kind of weapon Kanniainen had during the 1986 burglary.

In April of 1990, Opsahl again spoke with police investigators. This time he told them that Olson detested Kanniainen and suggested to Opsahl that they blame Kanniainen for the Rehmann murder. Opsahl said that he and Olson both knew that Kanniainen had been charged with a capital murder in Florida and was in jail when Opsahl first met with police in 1987.

In September of 1990, Opsahl was severely injured in an automobile accident and left a quadriplegic. The following month Opsahl recanted all his prior statements. Again Opsahl claimed that if Kanniainen had not done the killing, then he had no involvement either.

The McLeod County Attorney convened a grand jury in April, 1992, to determine whether to indict Opsahl for the crime. The grand jury heard testimony from many witnesses. One witness, Tim Efteland, told the grand jury three times during his testimony that Opsahl had taken and failed a lie detector test. The grand jury also saw three statements by Efteland and one by Jeff Olson referring to Opsahl having taken, and failed, a lie detector test. One grand juror asked Deputy Vinkemeier whether Opsahl had taken a lie detector test. The County Attorney instructed Vinkemeier not to answer that question and cautioned the jury about the inadmissibility of polygraph results. At the time of Efteland's testimony, and again at the conclusion of the State's evidence, the County Attorney gave the jurors cautionary instructions on the inadmissibility of polygraph evidence and the use they could make of Efteland's statements.

At Opsahl's trial in October of 1992, a number of Opsahl's friends and acquaintances testified to conversations they had had with either Opsahl and Olson together, or with Opsahl or Olson individually, where Op-

sahl and Olson had made comments implicating themselves in the Rehmann murder. At Opsal's trial, Olson exercised his right not to testify. The jury found Opsahl guilty of one count of first degree murder and two counts of second degree murder.

■ Opsahl claims the grand jury indictment was fatally flawed because, although the jurors heard Efteland testify that Opsahl had failed a lie detector test and were given statements by Efteland and Olson in which they referred to Opsahl taking a lie detector test, they were not told that Opsahl had actually passed the test. Opsahl cites in support of his claim certain well-established principles of our criminal law. Results of polygraph tests, as well as evidence that a defendant took, or refused to take such a test, are not admissible in Minnesota in either criminal or civil trials. *State v. Anderson,* 379 N.W.2d 70, 79 (Minn.1985), *cert. denied* 476 U.S. 1141, 106 S.Ct. 2248, 90 L.Ed.2d 694 (1986). Minn.R.Crim.P. 18.06, subd. 1 (1992), states that "[a]n indictment shall be based on evidence that would be admissible at trial * * *." Minn.R.Crim.P. 17.06 (1992) provides for a motion to attack an indictment when:

> Subd. 2(1)(a). The evidence admissible before the grand jury was not sufficient as required by these rules to establish the offense charged or any lesser or other included offense or any offense of a lesser degree; * * * [or]
>
> Subd. 2(2)(a). The indictment * * * does not substantially comply with the requirements prescribed by law to the prejudice of the substantial rights of the defendant.

We have observed that prosecutors "must exercise extreme caution to ensure that the grand jury retains its independent role in our legal system." *State v. Johnson,* 441 N.W.2d 460, 462 (Minn.1989).

Opsahl argues that because the grand jury heard false testimony, its independence was affected and the presentation of inadmissible evidence substantially prejudiced his rights.

Opsahl claims the facts in this case are similar to those in *State v. Inthavong,* 402 N.W.2d 799 (Minn.1987). There, we dismissed an indictment because the judge's instructions to the jury contained an erroneous statement of probable cause which the judge repeated three times. *Id.* at 802–03. Opsahl contends that the false testimony in his case is likewise a fundamental error and "the integrity of the grand jury system cannot afford the assumption that the jurors were not misled." *Id.*

We are not persuaded, however, that the indictment should be quashed. The prosecutor did not elicit the testimony about the polygraph tests. and properly cautioned the jurors on the use of polygraph statements, both at the time the statements were made and at the end of testimony. Indeed, when a grand juror asked Deputy Vinkemeier whether Opsahl had taken a lie detector test, the prosecutor did not allow Vinkemeier to answer, and then immediately cautioned the jurors. On our reading of the grand jury transcript, there is no suggestion that the references to the polygraph test had the effect of either denying Opsahl any substantial rights or destroying the independence of the grand jury. While the prosecutor should have redacted Efteland's and Olson's statements to remove mention of Opsahl taking polygraph tests, there was more than enough admissible evidence on which to base the indictment.[2] That the grand jurors heard inadmissible evidence is not sufficient to dismiss an indictment if there is sufficient admissible evidence to establish probable cause. Minn.R.Crim.P. 18.06, subd. 2 (1992); *State v. O'Dell,* 328 N.W.2d 730, 731 (Minn.1983) (holding that this court will not quash an indictment if the grand jury heard sufficient competent evidence to support it). As we have explained before, "a presumption of regularity attaches to [an] indictment, and it is a rare case where an indictment will be invalidated." *State v. Inthavong,* 402 N.W.2d 799, 801 (Minn.1987).

---

**2.** The admissible testimony presented to the grand jury included testimony from seven witnesses regarding statements they had heard Opsahl make or statements they heard Jeff Olson make in Opsahl's presence implicating Opsahl in the killing. In addition, the grand jury heard testimony from other witnesses and was presented other evidence that linked Opsahl to the crime.

■ Opsahl next asserts that it was error for the trial court to admit the testimony of a number of witnesses who were allowed to testify over objection regarding statements Olson and Efteland allegedly made, and that because both Olson and Efteland were unavailable to testify, he was denied his constitutional right to confront witnesses against him. Opsahl complains specifically about the testimony of Richard Rogowski, Kathleen Reckow, and Ross Reinitz. His complaint with Rogowski's and Reckow's testimony was that they were testifying as to what Efteland told them. On direct examination, the prosecutor asked Rogowski questions about a conversation between Rogowski, Olson, and Opsahl concerning a shooting during a burglary. The prosecutor did not elicit any testimony concerning what Efteland may have told Rogowski. On cross-examination, Opsahl's attorney asked whether Rogowski had not, in fact, learned of the conversation from Efteland. Similarly, on direct examination, Reckow testified to a conversation she had had with Opsahl. The prosecutor did not ask her about anything Efteland might have told her. Again, on cross-examination, counsel for Opsahl asked about conversations Reckow had with Efteland.

The State argues that not only did Opsahl's counsel elicit the testimony concerning Efteland from Rogowski and Reckow, he made no objection to this testimony at trial. The State also argues that the testimony of Rogowski and Reckow relating to Efteland was not important to the prosecution's case and its admission, if error, was harmless.

Because all of the testimony by Rogowski and Reckow on conversations they had with Efteland about Opsahl and the Rehmann murder were elicited by Opsahl's own attorney and not by the prosecutor, and because no objection was made at the time, we conclude that admission of the testimony was not error.

■ Opsahl next complains about the testimony of Ross Reinitz on incriminating statements Olson made to him in Opsahl's presence in the winter of 1988–1989. He contends the statements were inadmissible because the State failed to establish a conspiracy between Olson and Opsahl and be-

cause Olson's unavailability at trial prevented Opsahl from exercising his confrontation rights. These statements were properly admitted as adoptive admissions under Minn. R.Evid. 801(d)(2)(B). Therefore, we need not address their admissibility under the co-conspirator exception to the hearsay rule, Minn.R.Evid. 801(d)(2)(E).

■ Although Opsahl does not mention him by name, Corey Telhoester also testified to statements Olson made to him, but, unlike Reinitz, at a time when Opsahl was not present. This testimony was admitted as a statement against Olson's penal interests under Minn.R.Evid. 804(b)(3). Opsahl claims its admission violated his right of confrontation.

We conclude Telhoester's testimony was properly admitted according to the analysis we set out in *State v. Roby*, 463 N.W.2d 506 (Minn.1990). In *Roby* we applied a two-step analysis to decide whether the admission of a hearsay statement violated the confrontation clause:

(1) Is admissibility of the out-of-court statement necessary?

(2) Does the statement bear significant indicia of reliability?

*Id.* at 509. Here, the first step is met because Olson was unavailable to testify.

As to the second step, a number of facts establish the reliability of Olson's statements to Telhoester: Telhoester was Olson's friend; Olson recognized the incriminating nature of his statements at the time he made them; both Olson and Telhoester were sober when the statements were made; and other testimony corroborated the statements. In addition, factors we listed in *Roby* as relevant to determining reliability of hearsay statements support the admission of Telhoester's testimony. Olson had no motive to lie, he had no problems with his memory, and he had personal knowledge of the crime. *Roby*, 463 N.W.2d at 509 (citing *United States v. Massa*, 740 F.2d 629, 639 (8th Cir.1984), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985)).

Opsahl also raises generalized complaints about the hearsay testimony of other witnesses. All of that testimony related to con-

versations the witnesses had either with Opsahl alone, or with Opsahl and Olson together. Opsahl did not object to any of this testimony at the time of trial. On our review of the record, we find the testimony properly admitted.

 Next we consider Opsahl's claim that the evidence presented at trial was legally insufficient to convict him because it was entirely circumstantial and based in large measure on statements Opsahl made to investigators and to other individuals. Opsahl contends he should not have been convicted because no physical evidence links him to the crime and he had no motive to kill Mrs. Rehmann. He argues that the clean and orderly condition of the house when the body was discovered makes it unlikely that she was killed during a burglary. He also claims that many of those who testified against him are not credible because they are convicted felons and drug users.

In reviewing this question, we examine the evidence presented at trial by viewing it in the light most favorable to the verdict. We will assume that the jury disbelieved any testimony in conflict with the result it reached. *State v. Scruggs*, 421 N.W.2d 707, 713 (Minn.1988) (citing *State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978)).

We find there was sufficient evidence to convict Opsahl. He described the farm house to police, along with details that could only have been known by someone at the crime scene. Opsahl knew that a .44 caliber weapon was used, that older half-dollar coins were taken, and that there were chickens at the farm. Opsahl also made numerous admissions to the crime to his friends, including Ross Reinitz, Laura Roberts, Robert Beckman, Richard Rogowski, and his former girlfriend, Marina Allan. The jury had an opportunity to hear all the testimony and to evaluate the credibility of the witnesses. In our review, we must assume the jury believed the state's witnesses and rejected contrary evidence. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984); *State v. Engholm*, 290 N.W.2d 780, 784 (Minn.1980). Given that assumption, there was sufficient evidence to convict Opsahl.

The last issue presented in the appeal is whether, because of his physical condition, Opsahl's confinement at MCF–OPH constitutes cruel and unusual punishment under Minn. Const. art. I, § 5. As a quadriplegic, Opsahl is confined to a wheelchair. He asserts that to confine him to prison for life when he is already confined by his disabilities, is "akin to the physical torture which had been condemned long before the adoption of our constitution." This issue has no merit. Opsahl makes no allegation whatsoever that his physical or medical needs cannot be adequately met at MCF–OPH or that he has been improperly treated or cared for there. His confinement at MCF–OPH does not constitute cruel and unusual punishment.

Affirmed.