**STATE of Minnesota, Respondent,**

v.

**Troy Fredric MARTIN, Appellant.**

**No. A12–0667.**

Court of Appeals of Minnesota.

Dec. 24, 2012.

Lori Swanson, Attorney General, Eric Schieferdecker, Assistant Attorney General, St. Paul, MN; and Richard C. Mollin, Jr., Clearwater County Attorney, Bagley, MN, for respondent.

John D. Undem, Michael D. Undem, Undem Law Office, Grand Rapids, MN, for appellant.

Considered and decided by HALBROOKS, Presiding Judge; STAUBER, Judge; and COLLINS, Judge.[*]

## OPINION

STAUBER, Judge.

This court granted discretionary review of the order denying appellant Troy Martin's motion to dismiss an indictment charging him with aiding and abetting second-degree felony murder in the death of his sister Leisa Martin. The state has moved to strike two affidavits and references to them in appellant's brief. Because we conclude that the prosecutor's errors in presenting the case to the grand jury and the grand jury's exposure to inadmissible evidence tainted the indictment and undermined the independence of the grand jury, and because the affidavits are not relevant to the issues presented, we reverse, while granting the motion to strike.

## FACTS

Leisa Martin's body was found in Mahnomen County on October 31, 1998. She was last seen alive in the early morning hours of October 28, after a night of drinking with Todd Martin and S.M. S.M. had dropped Todd and Leisa off at the home of

[*] Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

their mother, where both were living. The cause of death was determined to be asphyxia.

When questioned, Todd Martin told police that he and the victim had gotten into an argument in the early morning of October 28, and that Leisa had left in anger, walking off down the road. Both Todd and his brother Troy, who was also living at his mother's house, denied any involvement in Leisa's death. The police investigation pointed to a family member, and Todd Martin in particular, but was stymied by a lack of physical evidence.

In January 2010, police were called to Troy Martin's residence by his wife when Todd appeared at their house in the early morning hours and pounded on the door. Police arrested Todd for DWI, and, on the way to jail, Todd stated he "want[ed] to die," made an apparent attempt to jump out of the squad car, and then began choking the officer as he drove. When Todd was transferred to another vehicle, he made more "suicidal suggestions," stating he "just wanted to end it," and mentioned Leisa's name several times.

Todd asked to speak to a police officer, and, a day or two later, disclosed that Leisa had not walked off after their argument, but rather, according to Todd, had been restrained by Troy. According to Todd, Leisa had passed out while Troy was pinning her to the ground, and when the brothers checked later, she was dead. Troy then convinced Todd, according to his story, to hide the body. After taking Todd's statement, police interviewed Troy, who denied any involvement in the death.

Leisa Martin's body was discovered on a road in a remote location some distance from the Martin residence where she was last seen alive. No physical evidence was found to connect either brother to the scene where the body was found or to the physical assault. After taking the state-ments from the two brothers in 2010, in which Todd Martin stated that Troy had physically restrained Leisa Martin and Troy denied any involvement in her death, prosecutors presented the case to a grand jury.

S.M. testified that on the night of October 27, 1998, she and Leisa went to a bar to celebrate S.M.'s birthday, and at some point Todd joined them. S.M. testified that she dropped Todd and Leisa off at the Martin home about 1:30 a.m. and saw them go up to the deck. Both were intoxicated.

Todd Martin testified that he and Leisa continued drinking beer on the deck and started arguing. Leisa threw a beer can at him, and Troy came out of the house and tried to calm the situation. Todd Martin testified that Troy wrestled with Leisa for a while, trying to restrain her, and eventually holding her down on the ground until it looked like she had passed out. They both checked on her, and she was not breathing. Todd testified that it was Troy who suggested hiding the body, and that they placed Leisa's body in the back seat and drove to the remote location where the body was later found.

A.T., a friend of both brothers, testified that he went with Troy Martin to search for Leisa in the area near where her body was later discovered. He also testified that he saw Troy and Troy's father Fred in the area at around the same period, and that Troy had test-driven four-wheelers in the area.

Troy Martin testified that he had gone to bed earlier in the evening of October 27, 1998, after working that day, and that he did not hear his siblings arguing. He denied assaulting Leisa Martin. The grand jurors asked numerous questions of him, including how often he had visited his sister's grave and whether he had cried over her death.

Dr. Fred Martin, the father, testified before the Martin brothers, stating that he had a "[f]ine" relationship with Troy, stating as fact that Troy was sleeping in the house when the crime occurred, and stating his opinion that Todd committed the crime.

During a recess in Troy Martin's testimony, a grand juror told the prosecutors that he or she had been contacted by the wife of a witness who had testified earlier, saying that her husband had been asked by Fred Martin to lie. The prosecutors asked the grand juror not to tell any of the other grand jurors. When asked if he or she could disregard the contact, the grand juror responded affirmatively.

The prosecutors discussed Fred Martin's testimony with the grand jury, indicating that the grand jury could consider whether to indict Fred Martin for perjury. They told the grand jury that other witnesses could be brought in to testify with respect to perjury charges and gave the grand jury copies of Fred Martin's statement to police to consider in relation to possible perjury charges. But, in the end, the prosecutors, after referring vaguely to the contact made by a witness's wife to a grand juror, informed the grand jury that the county attorney, rather than the grand jury, would address the Fred Martin perjury issue. And later, the woman who had allegedly contacted the grand juror testified, denying that she had said that Fred Martin had asked her husband to lie.

After Todd Martin testified, the prosecutors informed the grand jurors that they wanted them to deliberate on Todd Martin's case first, after which additional witnesses would be presented whose testimony would be presented only as to Troy.

The grand jury indicted Todd Martin on a charge of committing second-degree felony murder, either individually or "aided and abetted by another," while committing or attempting to commit false imprisonment of the victim. Thirteen days later, the grand jury reconvened and heard the testimony of S.B. about being raped by Todd Martin at a wedding reception in 1999. S.B., who was 14 years old at the time of the rape, testified that after Todd gave her two drinks with alcohol in them, he volunteered that he "never meant to hurt her," and "didn't mean to kill her," referring to Leisa Martin.

According to S.B., Todd described the night of the incident, without mentioning where Troy was during the argument and the assault on Leisa, which Todd admitted having committed. Todd told her that "he needed to get rid of the body," so he told Troy, and Troy helped him to move the body. According to S.B., Todd threatened to kill her if she told anyone what he had said. S.B. testified that Todd then proceeded to rape her.

At the close of the resumed case against Troy Martin, the prosecutors offered no summary of the evidence against Troy. The prosecutors re-instructed the grand jury on probable cause, and on the standard of proof beyond a reasonable doubt and referred the grand jurors to the written instructions that had been given them earlier. The grand jury indicted Troy Martin on the same charge on which they had indicted Todd Martin.

Troy Martin moved to dismiss the indictment. The district court denied the motion, and this court granted discretionary review.

## ISSUES

1. Did the prosecutors commit misconduct tainting the indictment by failing to inform the court of a witness's contact with a grand juror, by misstating the law to the grand jurors, by commenting on the effect

of a decision to indict, or by engaging in the deliberative phase of the proceeding?

2. Did the introduction of speculative evidence, character evidence, "vouching" testimony, reference to an offer to give a polygraph test, or other inadmissible evidence, taint the proceeding so as to require dismissal of the indictment?

3. Does the cumulative effect of any errors or misconduct established require dismissal of the indictment?

4. Should this court grant the state's motion to strike affidavits and portions of appellant's brief relating to the polygraph issue?

## ANALYSIS

■ A presumption of regularity attaches to a grand jury indictment, which will be invalidated only in a rare case. *State v. Inthavong,* 402 N.W.2d 799, 801 (Minn.1987). An indictment must be based on evidence admissible at trial, but the presentation of inadmissible evidence does not require dismissal if there is sufficient admissible evidence to sustain the indictment and the defendant does not show that "incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it." *State v. Roan,* 532 N.W.2d 563, 570 (Minn.1995) (quotation omitted). An indictment will be dismissed if "it is clear that the prosecutor knowingly committed misconduct in the presentation of evidence to the Grand Jury" and that such misconduct "substantially influenced the Grand Jury's decision to indict...." *State v. Montanaro,* 463 N.W.2d 281, 281 (Minn. 1990).

Martin presents a number of challenges to the grand jury proceeding that may be grouped into (1) claims of prosecutorial misconduct in conducting the proceeding, and (2) claims that the grand jury was exposed to evidence that would be inadmissible at trial.

## I. Claims of Procedural Misconduct

Martin argues that various prosecutorial missteps or misconduct tainted the grand jury process or undermined the independence of the grand jury. Martin argues that the prosecutors should have alerted the court when a grand juror reported that he or she had been told by a witness that her husband, also a witness at the proceeding, had been asked by Fred Martin to lie during his testimony. Martin also argues that the prosecutors impermissibly participated in the grand jury's deliberations by not only answering their legal questions but also discussing the evidence with them. These claims bear on the independence of the grand jury, as distinguished from the admissibility of the evidence presented to it.

The supreme court has expressed its concern that the independence of the grand jury from the prosecution must be preserved. *See State v. Johnson,* 441 N.W.2d 460, 462 (Minn.1989) (noting the tendency for prosecutors to view the grand jury as "a tool for their own convenience," and stating that they "must exercise extreme caution to ensure that the grand jury retains its independent role").

### A. Unauthorized Contact

■ On the fourth day of the proceedings, grand juror 21 disclosed that he or she had been contacted by the wife of M.L., a witness before the grand jury, who said that her husband had been asked by Fred Martin to lie and to say that the two of them had gone out searching for Leisa Martin. The prosecutors asked the grand juror not to "share that with anyone," said they would "likely" follow up on it, and elicited a promise that the grand juror would not let it affect his or her decision.

Martin argues that the prosecutors should have informed the court of this improper contact. As the state points out in its brief, however, the prosecutors later told the grand jury that it had informed the district court of the contact. But this occurred after the grand jury had reconvened to consider additional testimony presented only against Troy Martin. Thus, it was almost two weeks after the grand jury's initial deliberations but before the grand jury deliberated and returned an indictment against Troy Martin. The prosecutor described the improper contact as "relate[d] possibly to the charges and evidence as it relates to Fred Martin, ultimately."

Martin argues that the prosecutors' handling of the incident without any apparent intent at the time to involve the court sent an improper message of prosecutorial supervision, one that undermined the independence of the grand jury. The prosecutor's comment that "we would like to follow up on that" by sending a police officer to investigate may have suggested that the prosecution rather than the court would handle the incident. But the prosecutors later made a record of their discussion with the district court about this improper contact. They explained to the grand jurors that the matter would be pursued in the form of an investigation of Fred Martin for possible perjury charges, which was within the prosecution's discretion whether to pursue. *See State v. Krotzer,* 548 N.W.2d 252, 254 (Minn.1996) (discussing prosecution's charging authority).

The supreme court has also expressed concern about "improperly elevat[ing] the county attorney's rank in the grand jury proceedings over the rank of the jurors themselves." *Johnson,* 441 N.W.2d at 464. The district court is required to instruct the grand jury on its general responsibilities. Minn.Stat. § 628.56 (2010); Minn. R.Crim. P. 18.02, subd. 3. The district court has authority to determine when outside persons may be present in the grand jury proceeding and when disclosure of those proceedings is allowed. Minn. R.Crim. P. 18.03, .07. Most importantly, it is the court, not the prosecutor, that determines whether a grand juror should be excused. Minn. R.Crim. P. 18.08, subd. 2.

When one of the grand jurors reported a contact initiated by an outside person, a contact that could have justified the court in excusing the grand juror, the prosecutors should have immediately informed the district court. *See generally State v. Erickson,* 610 N.W.2d 335, 338 (Minn.2000) (holding that a private communication with a petit juror is presumptively prejudicial).

Moreover, it would have been better for the prosecutors not to indicate to the grand juror involved that the improper contact was a matter for the prosecutors to resolve. But the prosecutors eventually disclosed to the grand jury as a whole that the district court had been consulted. Although this occurred nearly two weeks later, when the grand jury reconvened to consider the charges against Troy Martin, one grand juror was in the meantime possibly left with the impression that the prosecution had sole supervisory power over the grand jury. We conclude that the prosecutor's handling of the incident did not significantly undermine the independence of the grand jury.

**B. Participation in Grand Jury Deliberations**

Martin argues that the prosecutor's extensive responses to grand jury questions during a break in their deliberations constituted an impermissible participation

in those deliberations.[1]

The rules forbid any person except the grand jurors from being present during the grand jury's deliberations. Minn. R.Crim. P. 18.03. The prosecutors did not enter the grand jury room during its formal deliberations, but after the grand jury had begun deliberations, it summoned them to answer two legal questions. The prosecutors responded to those questions with brief and straightforward answers. But the grand jurors called them back in later with a series of open-ended questions. A lengthy discussion followed in which the grand jurors disclosed what they had discussed and indicated the reason they had reached a stalemate. Individual grand jurors expressed their own opinions, apparently concerning areas of disagreement, or asked questions implying a personal opinion. The protracted discussion, in which the prosecutors participated, was not limited to focused legal questions, appeared to disclose grand juror opinions on the case, and was, therefore, indistinguishable from "deliberations."

During this second discussion, one of the prosecutors summarized the grand jury's questions as addressing "whether they can share with us some sticking points and ask questions about that." The other prosecutor responded positively:

> You can ask whatever you want. If we can't answer it, it's a resolution of a fact question, we probably can't. But sometimes the fact questions and law question are pretty closely related. But we can try to help the best we can.

When a grand juror asked what conduct would be sufficient to constitute aiding and abetting, one of the prosecutors attempted to draw factual distinctions, discussing how much physical involvement would be required for aiding and abetting, and expressing the opinion that "[h]olding a wrist" would probably be sufficient. The grand jurors then discussed the reason for their stalemate, focusing on their doubts as to which brother physically restrained Leisa Martin. Instead of declining to say anything regarding the reason for the stalemate, one of the prosecutors stated, "Yup. You have the two. And we have given you a probable cause suspicion." He added the qualifier "[i]f you believe it," but the comment suggested a resolution to the stalemate in favor of those leaning towards indictment.

■ The prosecutor acts as the legal advisor to the grand jury, and as such has a duty to answer legal questions the grand jury poses during a break in their deliberations. *See generally Inthavong*, 402 N.W.2d at 802 n. 4 (noting that county attorney has statutory duty to advise grand jury on applicable law). But in discussing the case in such depth with the grand jury after it had retired to deliberate, and particularly in responding to the concerns that had caused them to stalemate, rather than simply answering clearly defined legal questions, the prosecutors effectively participated in the deliberations.

The supreme court has discouraged prosecutors from including argument even in their closing statement to the grand jury. *State v. Penkaty*, 708 N.W.2d 185, 198 (Minn.2006). The prosecutors here in effect argued the case, at least the case for accomplice liability, in the middle of the grand jury's deliberations.

The grand jury's deliberations are closed to anyone except the grand jurors

---

1. The challenged statements occurred during the "first phase" of deliberations, before the evidence admissible only against Troy Martin was presented. But the grand jury's questions establish that they were considering the case against both brothers, and that the prosecution did not restrict this "first phase" of deliberations to the case against Todd Martin.

themselves. Minn. R.Crim. P. 18.03. The grand jury's deliberations may not be disclosed even to the prosecutor. *See* Minn. R.Crim. P. 18.07 ("Disclosure of matters occurring before the grand jury, other than its deliberations and the vote of any juror, may be made to the prosecutor"). The grand jury's retiring to deliberate, therefore, creates a boundary between that body and the prosecution. It was not the responsibility of the grand jurors here, unfamiliar with the grand jury process and faced with difficult issues, to police that boundary. The prosecutors, by participating in lengthy discussions with grand jurors who were airing their individual views and revealing the reason for their stalemate, effectively crossed that boundary, thereby undermining the independence of the grand jury.

### C. Comments on Effect of Indictment

■ Martin also argues that the prosecutors improperly commented on the effect of an indictment on future criminal proceedings. In response to a grand juror's question, one of the prosecutors indicated that if the grand jury returned an indictment there might be a guilty plea rather than a trial. The prosecutor stated: "It's a pretty powerful thing to have for a suspect to know that a Grand Jury has indicted him." The prosecutor also mentioned the possibility of a lesser-included offense being presented to the petit jury if the case went to trial, while discouraging grand jury speculation about sentencing possibilities.

■ "As a general rule, a grand jury should not be informed of other events in the criminal prosecution that are irrelevant to the grand jury's decision." *State v. Martin*, 567 N.W.2d 62, 68 (Minn.App. 1997), *review denied* (Minn. Sept. 18, 1997); *see also State v. Grose*, 387 N.W.2d

182, 188 (Minn.App.1986) (approving district court's criticism of prosecutorial comments on a defendant's likely sentence, which "is totally irrelevant to the issues of probable cause, and only serves to unduly prejudice the grand jury against the defendant"). The prosecutor here discouraged any grand jury consideration of possible sentences but openly speculated about the possibility of a guilty plea and implied that an indictment would put pressure on one or both of the Martin brothers to plead guilty.

These comments likely encouraged the grand jurors to consider themselves as an arm of the prosecution, whose interest in obtaining guilty pleas would be a proper consideration in their deliberations. *Cf. Johnson*, 441 N.W.2d at 462 (noting the "tendency for prosecutors to view the grand jury as a tool for their own convenience"). The grand jury's "historical function" is one of "shielding the accused from the prosecutor," *id.*, and not one of assuming a collaborative role with the government.

The comments were isolated and in themselves may not have prejudiced the independence of the grand jury. But combined with other conduct, discussed above, they tended to co-opt the grand jury and undermine its independence. And those combined effects must be considered along with the effects of any inadmissible evidence, as discussed below. *See id.* at 466 (considering cumulative effect of errors committed in grand jury proceeding).

### II. Claims of Inadmissible Evidence

■ Martin argues that the indictment should be dismissed because the grand jury was exposed to inadmissible evidence, particularly character evidence and speculative testimony, evidence that he did not take a polygraph test, and "vouching" testimony casting doubt on Martin's own credibility. The reception of

inadmissible evidence is not grounds to dismiss an indictment "if sufficient admissible evidence exists to support the indictment." Minn. R.Crim. P. 18.05, subd. 2; *see Penkaty*, 708 N.W.2d at 200. But an indictment will be dismissed on a showing that "incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it." *Roan*, 532 N.W.2d at 570 (quotation omitted).

Martin argues that the prosecution's case to the grand jury was full of improper speculation and character evidence that influenced the grand jury's decision to indict him. We agree. Although most of the questions eliciting gossip, speculation, and character judgments came from the grand jurors, the prosecutors in the end failed to restrain that questioning or to limit the witnesses to descriptions of what they actually saw and heard. The prosecutors actively solicited character evidence and speculation from a number of witnesses, and called a number of witnesses who appeared to have only speculation or character evidence to offer.

The first two witnesses to testify described Todd Martin as "lazy," and Troy Martin as a person who "didn't care." They testified to Troy as being his father's favorite, to Troy "doctoring" insurance papers, to which brother was more emotional at their sister's funeral, and, in general, to character flaws or subjective judgments far removed from the circumstances of Leisa Martin's death.

The prosecutors tried initially to restrain the grand jurors from questioning witnesses, for example, about how the brothers behaved at Leisa Martin's funeral. But the questions eliciting inadmissible evidence continued. And the prosecutors themselves occasionally asked questions eliciting character evidence, such as the question whether Troy Martin had cried over his sister's death.

The testimony was replete with speculation about what happened on the night of Leisa Martin's death. Fred Martin stated that he was sure that Todd committed the assault on Leisa, and that Troy was sleeping in the house when it happened. But he had no firsthand information on which to base these factual assertions. He stated as fact that Todd and a friend drove the body to the remote road where it was found. The prosecutor tried to restrain Fred Martin's testimony, but did not make the same effort with some of the other witnesses.

The state cites *State v. Butzin*, 404 N.W.2d 819, 827–28 (Minn.App.1987), *review denied* (Minn. June 9, 1987), in pointing out that much of the improper testimony came during questioning by grand jurors. But in *Butzin*, the grand juror questioning was directed at the police officer who interrogated the defendant, the murder victim's mother, and the doctor who performed the autopsy. *See id.* at 822–23, 827. These witnesses all had relevant testimony to offer (the victim's mother saw the defendant at two critical times just after the time of the victim's death). *Id.* at 822. Here, while some of the character evidence and speculative testimony came from police officers, or others who had some relevant testimony to offer, much of it came from witnesses who were called to testify despite having no firsthand information about relevant facts and little to offer but opinion as to the brothers' character and speculation as to the most likely perpetrator. The prosecutors candidly told the grand jury before calling the first witness that they were not sure what some of the Martin family members would say on the stand. When the testimony of those witnesses veered off into speculation and character judgments, the

grand jurors predictably chose to further explore those tangents.

The state argues that character evidence and evidence about relationships within the Martin family were relevant to show bias and to attempt to lift the family's "shroud of secrecy" surrounding Leisa Martin's death.[2] But the prosecutors did not indicate in their opening statement to the grand jury that charges of conspiracy, aiding an offender, or obstructing justice were under consideration. And they neither previewed nor produced any evidence of a family cover-up. As to the Martin brothers, evidence of their past relationship could show bias in their testimony regarding each other's involvement in Leisa Martin's death. But the prosecutors also allowed character evidence to be introduced about the Martin parents, who themselves had only irrelevant character evidence or speculation to offer.

The grand jury has an investigative role that permits it, for example, to issue its own subpoenas. *See State v. Richards,* 464 N.W.2d 540, 541 (Minn.App.1990) (noting that grand jury has both a screening function and, in its function of investigating crimes, the power to obtain evidence), *review denied* (Minn. Feb. 20, 1991). But it was not the grand jury's role to lift a family "shroud of secrecy" unless to do so would uncover criminal behavior or shed light on who caused Leisa Martin's death. The police had investigated Leisa Martin's death at length, interviewing several witnesses multiple times. And the prosecutors in presenting evidence to the grand jury never developed evidence of a family cover-up; moreover, the antagonistic relationship between the Martin parents would have made any such theory implausible.

Thus, the character evidence introduced against Martin family members, including Todd Martin, should not have been admitted.

## A. Vouching Testimony

■ Martin argues that the prosecutor elicited "vouching" evidence regarding the credibility or lack of credibility of various witnesses. He particularly complains of police testimony questioning his own credibility. Special Agent Museus from the Bureau of Criminal Apprehension (BCA), testified at some length about his interviews with Troy Martin in January 2010, after Todd implicated him in the crime. Agent Museus testified that Troy's statements were "incongruent," that his smiling was inconsistent with the subject of the conversation, that he was "manipulative," and that he was unable to express any emotion over his sister's death. Museus proceeded to offer his opinion on the relative credibility of the two brothers, stating in response to a grand juror's question that Todd "tells a story that, in my belief, is more believable." Although a grand juror elicited that opinion, the prosecutor had earlier elicited testimony about Troy' Martin's inappropriate demeanor, his "incongruent" statements, and whether Museus felt he was "getting played" by Troy Martin.

■ It is improper for a prosecutor to elicit a witness's opinion about the credibility of another witness. *See Van Buren v. State,* 556 N.W.2d 548, 550–52 (Minn.1996). The grand jurors listened to a tape of Troy Martin's statements to police. The prosecutor properly questioned Agent Museus about Martins demeanor, which the grand jury could not assess from the audiotape.

---

**2.** The state does not maintain that this evidence would be admissible as "relationship evidence" under Minn.Stat. § 634.20 (2010), which permits evidence of "similar conduct by the accused against the victim of domestic abuse" or against other family members. And almost all the evidence of past assaultive conduct was against Todd Martin.

But after Museus criticized Martin's demeanor, the prosecutor pursued the subject beyond the permissible bounds of demeanor and into the realm of credibility, asking whether Museus felt he was "getting played." When a grand juror later asked a demeanor-related question about "Troy's range of emotion," Museus treated it as a credibility question, offering the devastating personal opinion, coming from a police officer who had interviewed both brothers, that "Todd tells a story that, in my belief, is more believable."

We recognize that Troy Martin testified before the grand jury, and the grand jury itself could have confirmed the prosecutor's opinion that his demeanor on the stand was inappropriate. But the prosecutor elicited damaging "vouching" (or "disparaging") testimony from Agent Museus well before Martin took the stand. And, given the fact that the same testimony left the mistaken impression that Martin declined to take a polygraph, although police apparently failed to arrange one, the disparaging comments from a police officer about Martin's credibility are particularly prejudicial.

## B. Polygraph References

■ Martin points out that the grand jury learned that he had said he would take a polygraph but never did so. The question was put by a grand juror to Agent Museus. The prosecutor failed to cut off the question, or to instruct the witness not to answer.

■ Polygraph evidence is generally inadmissible. *See State v. Schaeffer,* 457 N.W.2d 194, 197 (Minn.1990). Multiple references at trial to polygraph testing have been held to be plain error requiring a new trial. *State v. Winter,* 668 N.W.2d 222, 226 (Minn.App.2003).

References to polygraphs in the grand jury proceeding do not necessarily require dismissal of the indictment. *State v. Opsahl,* 513 N.W.2d 249, 253 (Minn.1994). In *Opsahl,* one witness, apparently a police officer, had testified incorrectly that the defendant had failed a polygraph. *Id.* There were also references in written statements presented to the grand jury that the defendant had taken and failed a polygraph. *Id.* at 252. The supreme court noted, however, that "[t]he prosecutor did not elicit the testimony about the polygraph tests and properly cautioned the jurors on the use of polygraph statements, both at the time the statements were made and at the end of testimony." *Id.* at 253. The court concluded that, although the statements should have been redacted to remove these references, they did not have "the effect of either denying Opsahl any substantial rights or destroying the independence of the grand jury." *Id.*

■ Here, there was a single reference to polygraph testing in the testimony. As in *Opsahl,* the reference was not elicited by the prosecutor. There were also several references in the statements of both Todd and Troy Martin to police. Unfortunately, further explanation was needed to eliminate the inference that Troy Martin ultimately refused to take the polygraph. In his closing statement, one of the prosecutors told the grand jury to disregard the polygraph references. But this comment may have served only to remind the grand jury of that evidence.

The references to possible polygraph testing in the statements of both Todd and Troy Martin to police should have been redacted. *See Winter,* 668 N.W.2d at 226 (holding it was error to admit defendant's interview with police without redacting references to polygraph testing).[3] Although

**3.** Todd Martin did not respond when first

asked whether he would take a polygraph,

the prosecutor told the grand jury to disregard the polygraph references, the grand jury likely would not have been able to disregard the negative (and false) inference that Troy Martin had refused polygraph testing.

### III. Cumulative Effect of Errors

 Martin argues that the cumulative effect of the errors in the grand jury proceeding require dismissal of the indictment. "Cumulative error exists when the 'cumulative effect of the ... errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased [grand] jury.'" *Johnson*, 441 N.W.2d at 466 (quoting *United States v. Samango*, 607 F.2d 877, 884 (9th Cir. 1979)).

As indicated above, we conclude that the failure to notify the district court of the improper contact with a grand juror was error, and that the prosecutors improperly participated in the grand jury's deliberations and improperly discussed the impact of an indictment. The prosecutors also allowed considerable character evidence and speculative testimony to be presented to the grand jury, as well as the damaging "vouching" testimony of a police officer who testified that Troy Martin was less credible than his brother Todd.

The receipt of inadmissible evidence is not grounds for dismissal of the indictment if there is sufficient admissible evidence to support the indictment. Minn. R.Crim. P. 18.05, subd. 2. And an indictment need only be supported by probable cause. *Id.* But the presentation of inadmissible evidence requires dismissal even if there is sufficient admissible evidence to sustain the indictment as long as the defendant

can show that "incompetent evidence has so far influenced the grand jury that an indictment would not have been returned without it." *Roan*, 532 N.W.2d at 570.

In principle, Todd Martin's testimony is sufficient to support the indictment because his credibility was for the grand jury to assess. *See generally State v. Moore*, 438 N.W.2d 101, 108 (Minn.1989) (holding that in reviewing sufficiency of evidence, reviewing court must assume the jury believed the state's witnesses). We are troubled, however, that Todd Martin, despite testifying that Troy Martin alone caused Leisa Martin's death, gave inconsistent statements early in the case, confessed his own guilt to a 14–year–old girl in 1999 and then raped her, and assaulted a police officer in 2010 while apparently agitated over his responsibility for Leisa's death.

In contrast to this evidence, and the circumstantial evidence that Todd Martin was with Leisa Martin just before her death and admitted having a confrontation with her at that time, the evidence against Troy was meager. Other than Todd's testimony, the evidence against Troy Martin, as the state summarizes it, was the autopsy showing Leisa may have been assaulted by two people, Troy's unconvincing demeanor, and the fact that Troy was familiar with the area where the victim's body was found and was seen in the area around the same time.

The grand jury indicted Todd Martin despite his testimony that he merely observed Troy's wrestling with Leisa that resulted in her death. On the other hand, the grand jury also indicted Troy Martin based on that testimony, and we must assume that they credited Todd's testimony inculpating his brother.

then said he would talk to his father. In a subsequent statement, he again did not answer whether he would take the test. Finally,

he declined to take the test, stating that his father had told him not to.

But regardless of the sufficiency of the admissible evidence to support the indictment, we conclude that Troy Martin has shown that the grand jury would not have indicted him without the inadmissible evidence presented and the prosecutorial errors affecting the grand jury's independence. Given the abundant evidence against Todd Martin and the negative reflection on his credibility created by his own actions, a grand jury secure in its own independence from the prosecution would not have indicted Troy Martin without the inadmissible character evidence and speculative testimony, and without Agent Museus's disparagement of Troy Martin's credibility and his explicit assertion that Todd was more credible than Troy Martin.

## IV. Motion to Strike

Finally, the state has moved to strike the affidavits from counsel that were attached to his district court memorandum supporting his motion to dismiss the indictment. The state argues that this material is outside the record on appeal, and that portions of the appellant's brief relying on it should also be stricken. *See* Minn. R. Civ.App. P. 110.01 (stating that the record on appeal consists of the transcripts and papers and exhibits filed in the district court).

The affidavits challenged by the state were attached to the defense reply memorandum filed in the district court, and thus are included in the district court file. But the affidavits relate to events occurring after the grand jury proceeding itself. Therefore, we grant the state's motion to strike them and the argument in appellants brief that is based on them. *See State v. Speak*, 339 N.W.2d 741, 743 (Minn. 1983) (declining to consider matters outside the record on which the grand jury decided to indict that were cited in state's brief).

## DECISION

The indictment charging Troy Martin with second-degree murder in the course of false imprisonment was tainted by prosecutorial misconduct and the presentation of inadmissible evidence and must be dismissed. The state's motion to strike affidavits presented by appellant's counsel, as well as argument in appellant's brief based on them, is granted.

**Reversed; motion to strike granted.**